# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 02-3055

REYNOLD C. MOORE,

*Petitioner-Appellant,*

*v.*

STEVEN B. CASPERSON,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 99 C 408—**Patricia J. Gorence**, *Magistrate Judge.*

ARGUED MAY 14, 2003—DECIDED SEPTEMBER 29, 2003

Before POSNER, RIPPLE and MANION, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Reynold Moore was convicted in Wisconsin state court of first degree intentional homicide as a party to a crime, in violation of Wisconsin Statutes §§ 940.01 and 939.05. After having attempted without success to obtain relief through a post-conviction motion and in the Court of Appeals of Wisconsin, Mr. Moore filed a petition for review in the Supreme Court of Wisconsin, which was denied. In that petition, he included only three of his eight claims. Mr. Moore then petitioned for habeas

corpus relief. *See* 28 U.S.C. § 2254. The district court determined that the five claims not raised in the petition to the Supreme Court of Wisconsin were procedurally defaulted. With respect to the three remaining claims, the district court denied habeas relief on the merits. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A.

On November 10, 1992, Thomas Monfils, an employee at the James River Paper Mill, called the Green Bay, Wisconsin police department and anonymously informed the police that one of his coworkers, Keith Kutska, was planning to steal an expensive piece of electrical cord from the plant. The police informed the company of the tip. James River Security Guards Gary Schmitz and John Gilson stopped Kutska on his way out of the plant and asked Kutska to show them the contents of his bag. Kutska refused and received five days of unpaid suspension.

Monfils asked the police not to give anyone access to the tape of his call and not to disclose his identity. Although the police promised they would keep the tape confidential, they gave the tape to Kutska. Kutska recognized Monfils' voice and then brought the tape to work. He played the tape for various coworkers, including once for Monfils, in the number 9 control room (or "coop"). Connie Jones, a lab technician, who was at coop 9 to take readings from a machine, listened to the tape. As she returned to the lab, she encountered Mr. Moore. She told him about the tape and suggested that Mr. Moore go and listen to it. Mr. Moore

went and listened to the tape and was told that the voice was that of Monfils. He did not know Monfils.

Monfils left his post at coop 7 and was confronted around 7:35 a.m. by a group of workers near a water fountain between coops 7 and 9. Monfils was attacked and seriously injured. He ended up lying in a ball on the floor, unconscious but alive. At approximately 7:40 a.m., mill worker David Wiener observed, from the break room, that Dale Basten and Michael Johnson[1] were carrying something, which he could not see, toward a pulp vat. Johnson was walking backwards, and the two men were five to six feet apart.

At 7:45 a.m., Kutska and Mr. Moore entered coop 7, followed by Piaskowski. Kutska told Piaskowski to alert a supervisor that Monfils was missing. The next day, Monfils' partially decomposed body was found at the bottom of the pulp vat. A heavy weight, usually kept near machine 7, was tied around his neck. The coroner determined that Monfils died by asphyxiation due to the aspiration of paper pulp.

For two years, the Green Bay police made no progress in the case. But then, in April 1995, Brian Kellner told police that, on the previous Fourth of July, Kutska, after drinking an alleged forty beers, had admitted that he, Mr. Moore and several other coworkers had confronted Monfils near the water fountain after the 7:34 a.m. turnover. Kutska had drawn a diagram of where each defendant stood and had told Kellner that someone slapped Monfils and that Hirn

---

[1] Basten and Johnson were Mr. Moore's coworkers and codefendants. In all there were six defendants charged with the murder of Monfils: Mr. Moore, Basten, Johnson, Kutska, Michael Piaskowski and Michael Hirn.

shoved him. Kutska asked "what if" someone hit Monfils with a wrench or a board.

Kellner testified to Kutska's statement at trial, but, in a post-conviction proceeding, recanted some of his statement and testified that Kutska only identified himself, Hirn and Mr. Moore.

## B.

Mr. Moore, along with five codefendants, was charged with and convicted of first degree intentional homicide as a party to a crime. The only evidence about the confrontation with the decedent was the testimony of Kellner concerning Kutska's statement and the testimony of James Gilliam. Gilliam was incarcerated with Mr. Moore. He testified that, while in prison together, Mr. Moore had said that he, Kutska and others confronted Monfils, that Kutska initially hit Monfils and that Mr. Moore then decided that he would "just do it [hit Monfils] like everybody else and he was just came from with his fist over the head just like—just like hitting him on the head and he was just kicking and beating him." Tr. 10/13/1995 at 170. According to Gilliam, Mr. Moore said "he came over everybody else's arm and just started popping him in the head, I mean, with his fist." *Id.* at 171. However, according to Gilliam, Mr. Moore said that he was surprised to learn of Monfils' ultimate demise in the pulp vat.

The trial court gave the following limiting instruction to the jury:

> Some evidence has been received in this trial which re-lates to one or more of the defendants, without having any reference to the remaining defendants. In consider-ing and evaluating such evidence, you should exercise

the utmost care and discretion. Such evidence may be used only in considering whether the individual or individuals with whom it is concerned are guilty or not guilty. Such evidence must not be used or considered in any way against any of the other defendants who are not implicated by such evidence, either directly or by inference, except insofar as you may consider that evidence in connection with the instructions which have been given you regarding a conspiracy.

R.2, Ex.A at 20 (footnote omitted).

Another key state witness was Connie Jones, the lab technician who had told Mr. Moore about the tape and suggested that he listen to it. In all of her statements prior to trial, including her deposition and statements to the police, Jones had indicated that she saw Mr. Moore at about the time of a procedure known as a "turnover," which the factory records indicated took place at 7:34 a.m. Consequently, she had testified that she had seen Mr. Moore about 7:35 a.m. or soon thereafter. If that testimony was accurate, that indicated that Mr. Moore probably would have arrived at coop 9 slightly too late to have participated in the beating of Monfils.

About a week before trial, a member of the prosecution team met with Jones. The attorney asked Jones "whether [the procedure] could have been a paper break that she saw Tom Monfils working on as opposed to a turnover which the earlier statements had said." R.5, Ex.2 at 64. Factory records indicated that a "paper break"—a different procedure from a "turnover"—had been performed at 7:17 a.m. Jones said that she was not sure which she had seen because she never had observed both procedures. After this meeting with the prosecution, Jones, of her own volition, went to the factory and observed both procedures. On the basis of that observation, Jones came to believe that it was possible, and

perhaps even more likely, that she had seen a "paper break" rather than a turnover. The record indicates that she called the prosecution and informed them of her changed time frame. *See* R.5, Ex.2 at 70. The prosecution did not pass along this information to the defense until after trial began and, apparently, until after Jones had testified on October 3.

In Mr. Moore's opening statement, his defense counsel relied on the timing to make his argument that Mr. Moore arrived too late to take part in the beating. Counsel noted that Jones would state that she had seen a turnover, which the records indicate took place at 7:34 or 7:35, and had talked to Mr. Moore afterwards. *See* Tr. 9/27/1995 at 140. However, when Jones later testified, she stated that she was unsure as to whether she witnessed a paper break or a turnover. She explained at trial that the prosecution had mentioned to her that a paper break had been performed and thus "there was a possibility that what I saw was not an actual turnover, but a paper break." Tr. 10/3/1995 at 91. She then recounted that she had observed both procedures and that, although she remained unsure, she did think, based on differences in the procedures that she observed, that "[i]t would be more reasonable" to conclude that she had seen a paper break rather than a turnover. *Id.* at 92. Her conclusion with regard to timing was that she believed that she saw Mr. Moore "somewhere about 7:25," but that was merely "an approximation" and that it could "possibly" be "as late as 7:35," but it could not have been "as early as 7:15." *Id.* at 94.

Defense counsel for several of the defendants, including counsel for Mr. Moore, cross-examined Jones about her prior statements concerning what she had seen and the time frame in which she had seen it. Defense counsel for Kutska attempted to show from Jones' other testimony that she

could not have seen a paper break. *See id.* at 105. In cross-examination by Mr. Moore's own counsel, he attempted to show that Jones previously had testified that she had looked at a clock and thus her prior time frame was correct. *See id.* at 121. He further attempted to demonstrate that all of her prior inconsistent statements impeached her credibility. *See id.* at 119-25. Moreover, Mr. Moore's counsel further brought out on cross-examination that Jones had changed her testimony in the week before trial—after the prosecution had talked to her and suggested such a possibility. *See id.* at 125-26.

Mr. Moore testified at trial and indicated that he had seen Jones at the later time period (consistent with the turnover theory). At closing argument, the prosecution stated that Jones was

> a very important witness to Rey Moore because his defense rises and falls with Connie Jones. If Connie Jones can't make that a turnover that she saw just before she left the No. 9 coop and went back to the lab, then Rey Moore is sunk. Because Rey Moore is at that No. 9 coop much earlier than what he said on the witness stand.

Tr. 10/27/1995 at 238-39.

Also at trial, the defense, but not Mr. Moore's counsel, attempted to introduce a computer-generated animated videotape prepared by experts to establish that David Wiener, who had seen Johnson and Basten carrying the body to the vat, could not have seen them from his position. The trial court excluded the videotape because it found that the tape might mislead the jury. The trial court nevertheless admitted a videotape offered by the state that was taken from the room showing from various positions in the room what could and could not be seen. Mr. Moore was convicted of first degree homicide as a coconspirator with the other

defendants. The State's theory was that, after beating Monfils to unconsciousness, the group decided that they needed to cover up the severe beating of Monfils to avoid discharges. They therefore decided to throw the body in the vat.

## C.

Mr. Moore sought post-conviction relief. The state trial court refused to grant a new trial on the basis of the newly discovered evidence of Kellner's post-conviction partial recantation. The court explained that Kellner's initial testimony was not terribly credible, and neither was his recantation. The court stated that Kellner clearly "committed perjury either at the time of the trial or the February 1997 motion hearings," but that "[a]t what time he was lying is immaterial. His trial testimony established, if believed then, that certain named individuals were present at a confrontation near a 'bubbler.' It does nothing more than that." R.5, Ex.4 at 3. The court noted that the recantation was "not with respect to the incident as a whole, but rather with respect to the question of identification of individuals." *Id.* at 4. The court concluded that "Mr. Kellner's recantation would have no effect whatsoever on the result in the trial of these cases." *Id.* The court also stated that it had

> a great deal of difficulty in accepting that the recantation is in fact credible and indeed doubts that a reasonable jury would believe the recantation. However, even if such recantation were believable and a jury were to accept it as truthful, there is still no reasonable probability of a different result in the jury verdict.

*Id.* at 4-5.

The trial court found that no prosecutorial misconduct had occurred in the suggestion to Jones that she might have

seen a paper break and in her subsequent observance of both procedures at the factory. The court further found that Jones was a credible witness and that the prosecution had not engaged in misconduct by failing to tell the defense about Jones' changed time line. The court recognized that the "State must disclose evidence which might be material to the credibility of a witness," but here the "inconsistency in her testimony was readily apparent and counsel were able to, and in fact did, impeach her testimony through the use of prior statements and deposition testimony. . . . The evidence was indeed produced during the process of cross-examination and [the failure to give the defense such evidence at an earlier time] had no effect on the jury verdict." R.2, Ex.B at 5.

Finally, the trial court rejected Mr. Moore's ineffective assistance of counsel claim. It ruled that it could "find[] nothing deficient" in the performance of Mr. Moore's defense counsel. *Id.* at 6. Mr. Moore had argued that his counsel, upon hearing Jones' change in time frame, should have "then requested an adjournment or a mistrial or an evidentiary hearing to establish the basis for the surprise testimony." *Id.* The court held:

> Assuming that any of those things had been done, this Court can see no reason why an adjournment would have been granted, why a mistrial would have been granted or why an evidentiary hearing would have been held. As previously mentioned, it was simply a question of a witness testifying differently from previous statements. That is a fact of life in the course of a trial. Defense counsel had all the previous statements, had more than adequate opportunity to impeach, and did so.

*Id.*

**D.**

Mr. Moore appealed to the Court of Appeals of Wisconsin. He raised eight claims in his appeal: (1) that there was insufficient evidence for his conviction; (2) that he was entitled to a new trial based on Kellner's recantation; (3) that the court erroneously admitted hearsay evidence and permitted it to be used against all defendants; (4) that the court erred by denying the defendants' motions to sever; (5) that the court erroneously excluded impeachment evidence of a prosecution witness; (6) that the court erred in failing to admit a videotape; (7) that his conviction should be reversed based on the State's failure to disclose exculpatory and material evidence; and (8) that his counsel was ineffective. The court affirmed the judgment of the trial court in all respects.

The court held that Mr. Moore and his codefendants were not entitled to a new trial on the basis of the newly discovered evidence of Kellner's recantation. *See* R.2, Ex.A at 10. The court noted that, under Wisconsin law, a defendant is entitled to a new trial on the basis of newly discovered evidence if five criteria are met. *See id.* The court observed that "a recantation generally satisfies the first four requirements," *id.* at 12, but not necessarily the fifth requirement that "it is reasonably probable that a different result would be reached at a new trial," *id.* at 10. Relying on Wisconsin law, the court noted that "a determination by the trial court that the recantation is not credible is sufficient to conclude that it is not reasonably probable that a different result would be reached at a new trial." *Id.* at 13. Here, the appellate court continued, "the trial court [had] made two determinations[:] first, that the recantation was not credible and second, even if the recantation was credible, there was still no reasonable probability of a different result." *Id.* at 13 (footnotes omitted). The court concluded: "[T]he trial court

observed Kellner's testimony both at trial and at post-trial hearings. It found Kellner's reasons for changing his testimony unworthy of belief. We fail to see how the trial court's rejection of Kellner's recantation as credible was clearly erroneous and therefore we affirm." *Id.* at 14.

The court determined that Kellner's statement, as a "statement against interest," was reliable because it also included "self-inculpatory statements" and thus "was properly admissible as evidence, not only against Kutska, but also against Johnson, Basten and Moore." *Id.* at 29. As to severance, the Wisconsin appellate court noted that, under Wisconsin rules, "[i]f the district attorney intends to use the statement of a codefendant that implicates another defendant in the crime charged, the judge shall grant a severance as to any such defendant." *Id.* at 32. The Wisconsin court noted that this action was necessary to comply with *Bruton v. United States*, 391 U.S. 123 (1968), which prevents the use of a codefendant's statement inculpating another defendant at a joint trial based on the codefendant's Sixth Amendment right to confront witnesses. Nevertheless, the appellate court concluded that

> the trial court did not misuse its discretion for two reasons: first, Kutska's statement was self-inculpatory and directly admissible against all of his codefendants under a firmly-rooted hearsay exception, *see Williamson v. United States*, 512 U.S. [601, 603 (1999)];[2] and, second, because Kutska did testify in his own defense and was subject to cross-examination, no *Bruton* problem arose which would have required severance.

R.2, Ex.A at 32 (footnote omitted).

---

[2]  In *Williamson v. United States*, 512 U.S. 601, 603 (1999), the Court stated: "[A] declarant's squarely self-inculpatory confession . . . will likely be admissible . . . against accomplices of his who are being tried under a co-conspirator liability theory."

As to Mr. Moore's other claims, the court found that the prosecution's failure to notify Mr. Moore of Jones' change in testimony did not constitute prosecutorial misconduct under *Brady v. Maryland*, 373 U.S. 83 (1963), for failure to disclose material exculpatory evidence to a defendant. The court explained that Jones' change in testimony concerning the time line of events and whether she witnessed a turn-over or a paper break was "more damaging" to Mr. Moore rather than exculpatory or "favorable," and thus *Brady* did not apply. R.2, Ex.A at 43. The court also found that there was no evidence of incompetence by Mr. Moore's counsel.

Having been denied relief in the state intermediate appellate court, Mr. Moore next filed a petition for review in the Supreme Court of Wisconsin. The petition was denied. In that petition, Mr. Moore raised only three of the eight claims that he had brought before the appellate court, namely: (1) whether the State denied him due process by failing to disclose Jones' change in her testimony; (2) whether under *Brady v. Maryland*, 373 U.S. 83 (1963), the prosecutor was required to disclose Jones' statement because it was exculpatory and material; and (3) whether he was denied due process by failure to grant a new trial based on Kellner's recantation.

## E.

Mr. Moore then filed for a writ of habeas corpus in the district court. In that petition, he raised all eight claims that he had raised in the Wisconsin Court of Appeals. The district court determined that all but the three issues that had been presented to the Supreme Court of Wisconsin were procedurally defaulted.

The court addressed Mr. Moore's claim that he had been denied due process by the trial court's failure to grant him

a new trial. Recognizing the Supreme Court's statement in *Herrera v. Collins*, 506 U.S. 390, 400 (1993), that " '[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding,' " R.37 at 24 (quoting *Herrera*, 506 U.S. at 400), the district court explained that Mr. Moore "does not contend that there is any underlying constitutional violation with respect to the testimony of Mr. Kellner." *Id.* at 25. Rather, Mr. Moore's petition contended that the state trial court erred because Kellner's statement was allegedly the only trial evidence linking Mr. Moore to the confrontation (which the district court noted was an inaccurate summation of the record). Because Mr. Moore's only argument was "that if the new evidence was presented to the jury it might decide the case differently," and Mr. Moore had not pointed to any underlying constitutional violation with respect to Kellner's testimony, Mr. Moore had "not established that his due process rights were violated." *Id.*

The court then turned to Mr. Moore's claim that he was denied due process because the State failed to disclose Jones' change in testimony as required by *Brady v. Maryland*. It summarized the state appellate court's treatment of the *Brady* issue as follows:

> The Wisconsin court of appeals summarized that applicable law noting that due process requires disclosure only of evidence that is both favorable to the accused and material to either guilt or punishment. As an initial matter, the court of appeals noted that Ms. Jones's statement would not have been favorable to the petitioner because it enlarged the amount of time for the petitioner's involvement in the tape-playing incident

and the confrontation, and was actually more damaging evidence against the petitioner.

The court also distinguished *Giglio v. United States*, 405 U.S. 150 (1972), upon which the petitioner relied. The court of appeals stated that *Giglio* dealt with the State's failure to disclose a deal with a key prosecution witness that prevented the defendant from having evidence bearing on the witness's credibility and bias and that Ms. Jones's changed account is not the type of evidence bearing on credibility that requires disclosure. The court further stated that in the case before it, the defense had at its disposal, and did employ, all of Ms. Jones's prior inconsistent statements to impeach her present account and to attack her credibility before the jury.

*Id.* at 27 (internal citations omitted).

The district court then reviewed the requirements of *Brady*. The court stated that in order to succeed on a claim of a *Brady* violation, "a defendant must establish that 1) the prosecution suppressed or withheld evidence that 2) was favorable and 3) material to the defense." *Id.* at 28. The court further noted that "constitutional error results from its suppression by the government 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result in the proceeding would have been different.' " *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 686 (1985)).

The court then considered whether the state court's determination with respect to the *Brady* issue was contrary to federal law as articulated by the Supreme Court and concluded that it was not:

The state court correctly articulated the law with respect to the disclosure of *Brady* and *Giglo* [sic] evi-

> dence. The application of such law to the circumstance of this case was also correct. Significantly, this changed testimony was disclosed at trial. Counsel for the petitioner was able to cross-examine Ms. Jones at length regarding the change in her testimony. This cross examination began in the morning of trial and continued after the noon break. Petitioner's counsel had an additional opportunity to re-cross examine Ms. Jones again that afternoon. The petitioner clearly had an ample opportunity to cross-examine Ms. Jones with respect to the change in her testimony.

*Id.* at 30 (internal citations omitted). Consequently, because defense counsel had ample opportunity to address Jones' altered testimony, no prejudice to Mr. Moore occurred, and the state court was not acting contrary to federal law in finding that there was no *Brady* violation.

Finally, the district court turned to the issue of whether the state's action in influencing Jones' testimony constituted prosecutorial misconduct and therefore a denial of due process. With respect to this issue, the district court first observed that there was a question of procedural default: "[T]his claim was not pursued by the petitioner in the Wisconsin court of appeals or in his petition for review before the Wisconsin Supreme Court. As such, the petitioner could be deemed to have procedurally defaulted this claim. However, the respondent has not raised such contention." *Id.* at 31. Consequently, based on this court's decision in *Henderson v. Thieret*, 859 F.2d 492, 498 (7th Cir. 1988) (holding that a court is not permitted to override the State's implicit or explicit decision to forego a waiver defense), the district court proceeded to the merits of the claim.

The district court determined that Mr. Moore was not entitled to relief on this ground. The district court first re-

jected the State's contention that there was no Supreme Court precedent concerning a prosecutor allegedly influencing a witness to present knowingly false testimony: "It is well established that it is as much a prosecutor's duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. *See Berger v. United States*, 295 U.S. 78, 88 (1935)." *Id.* at 32. Furthermore, the court observed that there was precedent to establish that a prosecutor's failure to correct knowingly false testimony of a principal witness resulted in a due process violation. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959). However, the court continued, there was no contention that Jones' testimony was false. As well, the jury was privy to the circumstances which led to Jones' change in testimony and, therefore, could assess any credibility issues raised by the change. Consequently, the district court determined, no violation of due process similar to that in *Napue* had occurred, and Mr. Moore was not entitled to habeas relief based on this authority.

## II

## DISCUSSION

### A.

We first examine whether the district court erred in determining that the claims not submitted to the Supreme Court of Wisconsin were procedurally defaulted.

"A state prisoner . . . may obtain federal habeas review of his claim only if he has exhausted his state remedies and avoided procedurally defaulting his claim." *Thomas v. McCaughtry*, 201 F.3d 995, 999 (7th Cir. 2000). If a prisoner procedurally defaulted his claim,

he may obtain federal habeas relief only upon a show-
ing of cause and prejudice for the default or upon a
showing that a failure to grant him relief would work a
fundamental miscarriage of justice. A fundamental
miscarriage of justice occurs when "a constitutional
violation has probably resulted in the conviction of one
who is actually innocent."

*Id.* (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986);
additional internal citations omitted).

The district court held that Mr. Moore had procedurally
defaulted five of his eight claims by not including them
in his petition to the Supreme Court of Wisconsin, as re-
quired by *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999). Mr.
Moore raises two issues with respect to this determination:
First, he argues that the rule of *Boerckel* should not apply to
habeas petitions arising out of Wisconsin because of the
Supreme Court of Wisconsin's limited review; second, he
argues that, even if *Boerckel* does apply, he has shown
"cause" and "prejudice" to excuse his procedural default.
We shall address each of these submissions.

**1.**

"Section 2254(c) provides that a habeas petitioner 'shall
not be deemed to have exhausted the remedies available in
the courts of the State . . . if he has the right under the law of
the State to raise, by any available procedure, the question
presented." *Boerckel*, 526 U.S. at 844. The Court in *Boerckel*
explained that this requirement does not mean that the
prisoner has to "invoke *any possible* avenue of state court
review," such as repetitive post-conviction petitions and
extraordinary remedies. *Id.* at 844. Nevertheless, it held that
"a state prisoner must present his claims to a state supreme
court in a petition for discretionary review in order to

satisfy the exhaustion requirement." *Id.* at 839-40. The Court
limited its holding, noting that

> nothing in our decision today requires the exhaustion of
> any specific state remedy when a State has provided
> that that remedy is unavailable. . . . The exhaustion
> doctrine, in other words, turns on an inquiry into what
> procedures are "available" under state law. In sum,
> there is nothing in the exhaustion doctrine requiring
> federal courts to ignore a state law or rule providing
> that a given procedure is not available. We hold today
> only that the creation of a discretionary review system
> does not, without more, make review in the Illinois
> Supreme Court unavailable.

*Id.* at 847-48.

In submitting that he is not required to present all his
contentions to the Supreme Court of Wisconsin, Mr. Moore
essentially argues that, under Wisconsin law, review is
so narrow as to be unavailable. Mr. Moore relies on *Tucker
v. Department of Corrections*, 301 F.3d 1281 (11th Cir. 2002).
There, the Eleventh Circuit determined that *Boerckel* did
not require the invocation of the certification rule of the
Supreme Court of Florida. Notably, this procedure is ex-
tremely restrictive. According to *Tucker*, the Supreme Court
of Florida may only review cases when there is "an actual or
potential conflict within the law of the state" to be resolved
by an appeal or when a lower court certifies a question "of
great public importance" to the Supreme Court of Florida.
*Id.* at 1283. Thus, a petitioner has no general right to appeal
to the Supreme Court of Florida absent either certification of
a question by an intermediate appellate court or a conflict in
state law. Because the issues presented in *Tucker* did not
involve a conflict in state law, the Eleventh Circuit deter-
mined that state supreme court review was effectively
unavailable to the petitioner. It was the prerogative of the

intermediate appellate court, not the prisoner, to certify specific issues, and then only when the issue was of great public importance.

The procedure in Wisconsin is far less restrictive. Wisconsin Statutes § 809.62 provides that "[a] party may file with the supreme court a petition for review of an adverse decision of the court of appeals pursuant to s. 808.10 within 30 days of the decision of the court of appeals." Thus the ability to petition the court is *available*. Mr. Moore focuses on the next sentence, which states: "Supreme court review is a matter of judicial discretion, not of right, and will be granted only when special and important reasons are presented." Wis. Stat. § 809.62. Mr. Moore argues that this provision contrasts with the Illinois provision at issue in *Boerckel*, because the Illinois statute states that "a petition for leave to appeal to the Supreme Court from the Appellate Court may be filed by any party . . . as a matter of right. Whether such a petition will be granted is a matter of sound judicial discretion." ILCS S. Ct. Rule 315(a). We do not believe that these provisions are significantly different for present purposes. Both provide for a right to *file* a petition, but make actual review by the state's highest court a matter left to that court's discretion. This point was made in *Boerckel* itself:

> [A] petition for discretionary review in Illinois' Supreme Court is a normal, simple, and established part of the State's appellate review process. In the words of the statute, state prisoners have "the right . . . to raise" their claims through a petition for discretionary review in the State's highest court. § 2254(c). Granted, as Boerckel contends, . . . he has no right to *review* in the Illinois Supreme Court, but he does have a "right . . . to raise" his claims before that court. That is all § 2254(c) requires.

*Boerckel*, 526 U.S. at 845. In Wisconsin, state "Supreme Court review is a matter of judicial discretion, not of right." Although the Wisconsin statute sets forth certain criteria (including a "real and significant question of federal or state constitutional law," etc.), those criteria neither "control[] nor fully measur[e] the court's discretion," but rather "indicate criteria that will be considered." Wis. Stat. § 809.62(1). Thus, it is a discretionary system like the Illinois system, and not like the Florida system discussed in *Tucker*, in which the Supreme Court of Florida was rigidly limited to two very well-defined types of cases. Thus *Boerckel* applies.

**2.**

Mr. Moore next submits that his procedural default ought to be excused because he has shown "cause" and "prejudice" for his failure to apprise the Supreme Court of Wisconsin of the contentions that he omitted from his petition to that court. Mr. Moore contends that there is cause because (1) he relied upon existing Seventh Circuit precedent; and (2) his counsel attempted to comply with the Supreme Court of Wisconsin's rules. He submits that he can demonstrate "prejudice" because the contentions that he omitted before the Supreme Court of Wisconsin are meritorious.

**a.**

Mr. Moore's submission that he relied in good faith on existing Seventh Circuit precedent is grounded in *Murray v. Carrier*, 477 U.S. 478 (1986). In that case, the Supreme Court stated that "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that

some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," such as "showing that the factual or legal basis for a claim was not reasonably available to counsel . . . or that some interference by officials made compliance impracticable." *Id.* at 488 (internal quotation marks and citations omitted). Mr. Moore submits that his counsel relied upon then-existing Seventh Circuit precedent, overruled by *Boerckel*, that had maintained that it was not necessary to raise an issue in a discretionary appeal in the state judicial system in order to preserve the matter for review in a federal habeas corpus proceeding.[3] In his view, this reliance constitutes "cause."

We cannot accept this argument. Our precedent simply stated that a petitioner *need not* include all of his claims in his petition to a state's highest court. This rule is hardly an "objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule," such as "showing that the factual or legal basis for a claim was not reasonably available to counsel." *Id.* Mr. Moore's counsel still was able, under Wisconsin law, to bring forth all claims in the petition; our precedent merely said that counsel did not *have* to do so in order to avoid a procedural default.

On this point, we are in agreement with our colleagues on the United States Court of Appeals for the Eleventh Circuit. In *Smith v. Jones*, 256 F.3d 1135 (11th Cir. 2001), *cert. denied*, 534 U.S. 1136 (2002), that court framed the question as whether "erroneous circuit law can serve as cause to excuse

---

[3] *See Boerckel v. O'Sullivan*, 135 F.3d 1194, 1198 (7th Cir. 1998) (reviewing history of the Seventh Circuit rule), *rev'd*, 526 U.S. 838 (1999); *Hogan v. McBride*, 74 F.3d 144, 146 (7th Cir. 1996), *modified on other grounds on denial of rehearing*, 79 F.3d 578 (7th Cir 1996).

a failure to comply with a retrospectively applicable rule announced in a Supreme Court decision which overrules that circuit law." *Id.* at 1142. The Eleventh Circuit determined that reliance on prior erroneous Eleventh Circuit precedent was not "cause." The court relied in part on the "Supreme Court's application of its new rule to the *Boerckel* case itself," which "requires that we apply that rule to this and all other pending cases." *Id.* at 1144 (noting that the court in *Boerckel* itself applied its decision retroactively against Boerckel, concluding that he had procedurally defaulted). The Eleventh Circuit also noted that, under the *Carrier* standard, the "subsequently overruled circuit decision . . . did not actually 'impede' the effort to comply with any state court rule, but instead removed an incentive for compliance by indicating (erroneously) that a particular action was not necessary for federal habeas review purposes." *Id.* at 1145. Finally, the Eleventh Circuit stated that

> a holding that reliance upon prior law is cause would effectively make the applicability of *Boerckel* and some other Supreme Court habeas decision "shift and spring according to the particular equities of individual parties' claims of actual reliance on an old rule and of harm from a retroactive application of the new rule." *Harper* [*v. Virginia Dep't of Taxation*, 509 U.S. 86, 96 (1993)] . . . . The Supreme Court told us in *Harper* that is something not to be done.

*Id.* at 1145.

Although we have not directly addressed the issue before us today, we clearly have held that *Boerckel* is retroactive in application, even though prior to *Boerckel*, our circuit precedent stated a rule opposite to that articulated by the Supreme Court in that case. *See Rittenhouse v. Battles*, 263 F.3d 689, 697 (7th Cir. 2001); *see also Smith v. Jones*, 256 F.3d 1135,

1142 n.7 (11th Cir. 2001) (detailing the evolution of our precedent on the issue of whether all claims need be included in the petition to the highest state court up until *Boerckel*). In *Rittenhouse*, we reversed the district court that had held that there was no procedural default because "Rittenhouse [had] filed his petition when the decisions of this court held that he did not default issues if he left them out of this petition for leave to appeal." *Rittenhouse*, 263 F.3d at 697 (internal quotation marks and citations omitted). The district court had determined that it "would not default Rittenhouse for following the then existing procedural law of the [Seventh] Circuit." *Id.* (internal quotation marks and citations omitted). Although in *Rittenhouse* we did not discuss "cause," we gave no hint that the petitioner's reliance on pre-*Boerckel* decisions could possibly constitute cause. *See id.*

**b.**

Mr. Moore further submits that, in omitting this issue from his petition to the Supreme Court of Wisconsin, his counsel simply was attempting to comply with Wisconsin's rules. This attempt, he argues, ought to constitute "cause."

Mr. Moore argues that his counsel failed to raise all of his claims in the petition because he wanted to include in his petition only those claims that met the criteria set forth in the Wisconsin rules. In presenting this argument, Mr. Moore relies on the dissent in *Boerckel* and our overturned *Boerckel* decision for this argument. *See* Petitioner's Br. at 41-44. We are constrained to follow the majority holding.

**3.**

Even if we were able to say that Mr. Moore had made out a case for "cause," we would find it difficult, on the record

before us, to say that Mr. Moore has made a sufficient case to demonstrate "prejudice."[4]

**a.**

Mr. Moore claims there was insufficient evidence to convict him. We considered a similar claim in a habeas petition filed by one of Mr. Moore's codefendants. *See Piaskowski v. Bett*, 256 F.3d 687 (7th Cir. 2001). In that instance, we noted that our inquiry is whether the Wisconsin Court of Appeals' decision "that a rational jury could have convicted [the defendant] based on this record resulted from an objectively unreasonable application of *Jackson* [*v. Virginia*, 443 U.S. 307 (1979)]." *Id.* at 690. As we noted in *Piaskowski, Jackson* explained that "due process requires reversal of a criminal conviction if, viewing the evidence in the light most favorable to the prosecution, no 'rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.* (quoting *Jackson*, 443 U.S. at 319).

We determined there that the evidence was insufficient to convict Piaskowski. However, the evidence concerning Mr. Moore and Piaskowski is different. Gilliam testified to a statement made by Mr. Moore that Mr. Moore had said he helped in the beating of Monfils. There was no evidence that Piaskowski had participated in the beating or even in the confrontation. We stated:

---

[4] Mr. Moore does not fully develop his arguments for prejudice. In his own words, "[t]he claims not addressed by the district court are neither presented nor briefed in their entirety but are included in a *prima facie* form to support petitioner's argument that he was prejudiced by the district court's failure to review his barred claims on the merits." Petitioner's Br. at 58 n.15.

The most serious error the court of appeals made is that it found—without reference to any supporting evidence—that Piaskowski "kicked and beat Monfils" during the confrontation near the bubbler. If the evidence supported this assertion, we would agree that a rational jury could have convicted Piaskowski and that an appellate court reasonably could have affirmed his conviction.

*Id.* at 693-94. Such evidence exists against Mr. Moore.

**b.**

Mr. Moore submits that the state appellate court committed constitutional error in admitting Kutska's statement that directly implicated Mr. Moore by name. *See Bruton v. United States*, 391 U.S. 123 (1968) (recognizing that the admission of a codefendant's confession that inculpates a joint defendant denies the defendant his Sixth Amendment right to confrontation); *Richardson v. Marsh*, 481 U.S. 200 (1987); and *Lilly v. Virginia*, 527 U.S. 116 (1999). Kellner testified before the jury that Kutska, on July 4, 1994, had described the confrontation between Monfils and the other employees. Kellner's testimony concerning Kutska's statement repeatedly and directly referred to Mr. Moore by name as participating in the confrontation. *See* Tr. 10/5/1995 at 3, 6-9, 15-17. Indeed, in our prior adjudication dealing with Monfils' murder, although we ultimately held that there was insufficient evidence to convict Piaskowski, we nevertheless noted in passing "the weighty Sixth Amendment Confrontation Clause problems inherent in the use of the testimony of Kellner and Gilliam against Piaskowski." *Piaskowski*, 256 F.3d at 692.

As the state court determined, however, Kutska testified at trial, thus curing any *Bruton* error. As the Supreme Court

held in *Nelson v. O'Neil*, 402 U.S. 622 (1971), a defendant's confrontation clause rights are "not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination." *Id.* at 626 (internal quotation marks and citations omitted). There is no claim here that Kutska was not subject to full and effective cross-examination.

**c.**

Mr. Moore next submits that the trial court denied Mr. Moore a fair trial by excluding the defense computer-generated videotape.

"On a petition for writ of habeas corpus, a federal court will not review evidentiary questions unless there is a resultant denial of fundamental fairness or the denial of a specific constitutional right." *Stomner v. Kolb*, 903 F.2d 1123, 1128 (7th Cir. 1990) (internal quotation marks and citations omitted). The Supreme Court has recognized that "the Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that . . . . poses an undue risk of harassment, prejudice, [or] confusion of the issues." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986) (internal quotation marks and citations omitted). The state court found that the computer-generated version would mislead the jury because it did not accurately account for possible movement by persons or for placement of objects in the room. The fact that the video failed to account for essential variables and thus might mislead the jury is a "valid state justification" for having excluded the evidence. *Crane*, 476 U.S. at 690.

**d.**

Mr. Moore next claims that his counsel was constitutionally ineffective. To establish an ineffective assistance of counsel claim, Mr. Moore must demonstrate that (1) his "counsel's representation fell below an objective standard of reasonableness; and (2) that he was prejudiced in that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Mr. Moore's argument that he was denied effective assistance of counsel is based on his counsel's failure to challenge, other than through cross-examination, Jones' testimony about the changed time line. Mr. Moore argues that his counsel should have requested a continuance, sought a mistrial, or moved that the testimony be struck. Rather, Mr. Moore's counsel cross-examined Jones and showed that she repeatedly had testified under oath to a contrary time frame. Mr. Moore's counsel's decision to use cross-examination to alleviate the new testimony did not constitute "representation [that] fell below an objective standard of reasonableness." *Id. Strickland* permits counsel to make strategic decisions and this decision appears to fit well into that category.

**B.**

We now turn to those claims that were properly before the district court and on which that court ruled on the merits. Under the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254, ("AEDPA"), "habeas relief may be granted if a state court's adjudication of a matter 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

States.'" *Dixon v. Snyder*, 266 F.3d 693, 699 (7th Cir. 2001) (quoting 28 U.S.C. § 2254(d)(1)).

> A state court decision is "contrary to" Supreme Court precedent [1] "if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law" or [2] "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that reached by the Supreme Court]." An "unreasonable application" of Supreme Court precedent occurs when "the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [the Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."

*Id.* at 700 (quoting *Williams v. Taylor*, 529 U.S. 362, 405, 407 (2000) (footnotes and additional citations omitted)).

"We review a state court decision de novo to determine whether it was 'contrary to' Supreme Court precedent; however, we defer to reasonable state court decisions." *Id.* Thus "[i]n order to issue a writ of habeas corpus, the state court decision must be both 'incorrect *and* unreasonable.'" *Id.* (quoting *Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000)).

**1.**

The Wisconsin Court of Appeals held that Mr. Moore was not entitled to a new trial based on the newly discovered evidence of Kellner's partial recantation of his trial testi-

mony concerning Kutska's Fourth of July statement. Under Wisconsin law, to be entitled to a new trial on the basis of newly discovered evidence, the defendant must show that " 'it is reasonably probable that a different result would be reached at a new trial.' " R.2, Ex.A at 10 (quoting *State v. Terrance J.W.*, 550 N.W.2d 445, 447 (Wis. Ct. App. 1996)). The Wisconsin Court of Appeals affirmed the trial court's denial of a new trial to Mr. Moore. It could find no evidence indicating that the trial court clearly had erred in finding that Kellner's recantation did not create a reasonable probability of a different outcome at trial. *See* R.2, Ex.A at 12-14. Mr. Moore claims that the failure to grant him a new trial denied him due process of law in light of the new evidence of Kellner's recantation.

"As a general rule, newly discovered evidence that bears only on the question of guilt or innocence is not reviewable by a federal court on a motion for habeas corpus relief." *Coogan v. McCaughtry*, 958 F.2d 793, 801 (7th Cir. 1992). Nonetheless, we have held that "in some situations newly discovered evidence is so compelling that it would be a violation of the fundamental fairness embodied in the Due Process Clause not to afford a defendant a new trial in which the evidence could be considered." *Id.* (internal quotation marks and citations omitted). We have noted that

> [w]here the "newly discovered evidence" consists of witness recantations of trial testimony or confessions by others of the crime, most courts decline to consider it in the absence of any showing that the prosecution knowingly proffered false testimony or failed to disclose exculpatory evidence, or that petitioner's counsel was ineffective.

*Id.* In the words of the Supreme Court,

> [c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal relief absent an independent constitutional violation occurring in the underlying state criminal proceeding. . . . This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact.

*Herrera v. Collins*, 506 U.S. 390, 400 (1993).

Under AEDPA, as noted above, Mr. Moore must show that the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Mr. Moore has not even attempted to meet this standard. His primary contentions to the district court and to this court are that the Wisconsin appellate court erred in finding that the recanted testimony did not create a reasonable probability of a different outcome at trial, *see* Petitioner's Br. at 56-59, and that the recantation would have had an enormous impact on the trial evidence against Mr. Moore, *see id.* at 59-62.[5] Neither of these contentions demonstrate that the

---

[5] Although this contention, even if accurate, would not be sufficient to support habeas relief, we note that the record refutes it and supports the Wisconsin courts' findings that the recanted testimony did not create a reasonable probability of a different outcome at trial for Mr. Moore. First, other evidence was admitted at trial of Mr. Moore's participation in the confrontation, such as Mr. Moore's statement to Gilliam that he repeatedly hit Monfils. *See* Tr. 10/13/1995 at 170-71. Second, even under the recanted version of Kellner's testimony, Kellner identified three persons: Kutska, Hirn and Mr. Moore. *See* Tr. 2/12/1997 at 53

(continued...)

Wisconsin appellate court's affirmance under Wisconsin law of the trial court's denial of a new trial was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.[6]

---

[5] (...continued)
(Kellner stating during his recantation that, in reality, Kutska drew a diagram in which he "put Mike Hirn there, he put Rey Moore there, and then he didn't put anybody else there" and that "[h]e just had spots" for other unidentified participants). Mr. Moore, in his reply brief, also points to language we employed in our opinion with respect to an appeal of his codefendant, Piaskowski, that "Kutska's account implicated only Hirn by name as a participant in the beating of Monfils." Reply Br. at 6. Yet, in that decision, *Piaskowski v. Bett*, 256 F.3d 687, 690, 692 (7th Cir. 2001), we stated twice that Kellner's recanted testimony of Kutska's statement only identified "himself, Hirn *and Moore*." *Id.* at 690 (emphasis added); *see id.* at 692 ("Kellner recanted a key portion of his trial testimony . . . during postconviction proceedings, claiming that Kutska did not identify any member of the group that confronted Monfils other than himself, Hirn, and Moore.").

[6] Apparently in an attempt to supply the needed "underlying constitutional violation" that the district court noted was absent from Mr. Moore's habeas petition to the district court, *see* R.37 at 25, Mr. Moore also makes a claim that the investigator's actions in badgering Kellner to make a statement prior to trial constituted an independent constitutional violation under *Washington v. Texas*, 388 U.S. 14, 19 (1967). He claims the investigator's actions denied him the right to present his case. This argument is tenuous at best. Mr. Moore has not identified at all the offensive conduct, nor has he provided citation to the record concerning any illegal treatment by the detective.

We note that, even if our review were not limited by the AEDPA standard, Mr. Moore has failed to even argue to this
(continued...)

**2.**

Mr. Moore claims that the prosecution's failure to disclose Jones' change in testimony in a timely manner denied him due process of law, contrary to the Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83 (1963). The Wisconsin appellate court held that there was no *Brady* problem because Jones' change in testimony concerning the time line of events and whether she witnessed a turnover or a paper break was "more damaging" to Mr. Moore's case rather

---

[6]  (...continued)

court that, with regard to Kellner's original testimony and recantation, "the prosecution knowingly proffered false testimony or failed to discolse exculpatory evidence, or that petitioner's counsel was ineffective*." Coogan*, 958 F.2d at 801. There was evidence that Kellner felt badgered and threatened with the loss of custody of his children by the investigating police officer into giving his initial statement and that this situation was the cause for his initial partially "untruthful" statement. Nevertheless, Kellner's recantation does not indicate that the *prosecution* knowingly used false testimony (and Mr. Moore did not argue that the prosecution did use false testimony), in light of the fact that Kellner himself testified that he never told the District Attorney or the prosecution that the investigating police officer had threatened or badgered him into giving the statement or that the contents of his statement to the police were false; although he testified that he did tell the District Attorney and the prosecution that he was unhappy with the statement without telling them that anything in it was false. The District Attorney and prosecution explained that Kellner could fix any discrepancies or problems with the statement when Kellner testified in court. *See* Tr. 2/12/1997 at 76-77. Kellner testified that, during the trial, he inquired of the prosecutor when they would ask him about correcting some of the problems with his written statement to the police; yet he failed to inform or indicate to the prosecution that he was currently giving untruthful testimony in court. *See id.* at 79-80.

than exculpatory or "favorable," and thus *Brady* did not apply. R.2, Ex.A at 43. Additionally, the Wisconsin appellate court noted that the defense did not lose its opportunity to use the new statement to impeach Jones, but that "the defense had at its disposal, and did employ, all of Jones's prior inconsistent statements to impeach her present account and attack her credibility before the jury." *Id.* at 44. Moreover, the Wisconsin appellate court found that Jones' statement was not material as defined by *Brady* because "there is not a reasonable probability that had the prosecution given the information to Moore, a different result would have occurred" because "Jones still would have been subject to cross-examination using the same methods actually employed by Moore's counsel." *Id.*

Under *Brady v. Maryland,* " 'the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' " *Kyles v. Whitley,* 514 U.S. 419, 433 (1995) (quoting *Brady,* 373 U.S. at 87). Thus, "[t]he holding in *Brady v. Maryland* requires disclosure only of evidence that is both favorable to the accused and material either to guilt or to punishment." *United States v. Bagley,* 473 U.S. 667, 674 (1985) (internal quotation marks omitted). Favorable evidence under *Brady,* which the prosecution is required to disclose includes both "exculpatory and impeachment evidence." *Kyles,* 514 U.S. at 433. Evidence is material if there is "a reasonable probability that, had it not been for the improprieties, the defendants would have been acquitted." *United States v. Boyd,* 55 F.3d 239, 245 (7th Cir. 1995).

Moreover,

> [a]lthough the government is required to turn over exculpatory information, a delay in doing so violates due process only if the delay prevent(ed) the defendant

from receiving a fair trial. A defendant receives a fair trial as long as disclosure is made before it is too late for the defendant to make use of any benefits of the evidence.

*United States v. Perez*, 870 F.2d 1222, 1228 (7th Cir. 1989) (internal citations and quotation marks omitted). In fact, there "is nothing in *Brady* . . . to require that such disclosures be made before trial" because "[a]s long as ultimate disclosure is made before it is too late for the defendant[] to make use of any benefits of the evidence, Due Process is satisfied." *United States v. Allain*, 671 F.2d 248, 255 (7th Cir. 1982) (internal quotation marks and citations omitted).

Mr. Moore submits that the prosecution was required under *Brady* to disclose that, when she testified at trial, Connie Jones was going to change her testimony concerning her time line of events.

Here, even assuming the material qualifies as being "favorable," it appears that Mr. Moore's counsel was able to use the prior inconsistent statements and perform an effective cross-examination of Jones. Although the prosecution "delayed" giving the information to Mr. Moore, "defense counsel was able to make good use of the impeaching evidence in his vigorous cross-examination of the prosecution witness" and thus "the defendant's due process rights were not violated" because there "is nothing in *Brady* . . . to require that such disclosures be made before trial." *Allain*, 671 F.2d at 255. Additionally, we agree with the Wisconsin appellate court that the evidence was not material because there was not "a reasonable probability that, had it not been for the improprieties, the defendants would have been acquitted." *United States v. Boyd*, 55 F.3d 239, 245 (1995). Mr. Moore has brought forth no evidence that, had the prosecution immediately informed Mr. Moore's counsel of the change in Jones' time line, the result at trial would have

been different. As the Wisconsin appellate court noted, the defense counsel would have impeached Jones with her prior statements, exactly as counsel was able to do at trial. *See* Tr. 10/3/1995 at 99-126.

Consequently, we hold that the Wisconsin appellate court decision was not contrary to or an unreasonable application of *Brady* or its progeny.

### 3.

Mr. Moore's final argument also relates to Jones' changed testimony.[7] Relying on *Napue v. Illinois*, 360 U.S. 264 (1959) and *Berger v. United States*, 295 U.S. 78 (1935), Mr. Moore argues that the prosecution's conduct in "suggesting" that Jones may have seen a paper break rather than a turnover denied Mr. Moore due process. *Napue* stands for the proposition that a prosecutor cannot "knowingly use false evidence," *Napue*, 360 U.S. at 269; *Berger* stands for the proposition that the prosecution cannot engage in "pronounced and persistent" misconduct and has a "duty to refrain from improper methods calculated to produce a wrongful conviction," *Berger*, 295 U.S. at 88-89. The prosecution here did not knowingly introduce any false testimony by allowing Jones to change her time line. Jones testified that her reason for going to the factory and viewing the procedures and subsequently changing her time line was that she wanted to be as accurate as possible; moreover, she still testified that she was "unsure" as to which procedure

---

[7] It appears that Mr. Moore did not raise this claim before the Wisconsin Court of Appeals or the Supreme Court of Wisconsin. However, as noted by the district court, the respondent does not argue (or even mention) that this claim is procedurally defaulted. Consequently, we will address the merits of this claim.

she had seen. Also, the prosecution did not badger or harass or otherwise act improperly to procure this testimony, as was done in *Berger*. Consequently, we cannot conclude that Mr. Moore is entitled to relief on this basis.

## Conclusion

For the foregoing reasons, we believe that the district court committed no reversible error in its adjudication of this petition for relief under 28 U.S.C. § 2254. Accordingly, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*