In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1159

MICHAEL L. PIASKOWSKI,

Petitioner-Appellee,

v.

JOHN BETT,

Respondent-Appellant.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 99-C-1428--Myron L. Gordon, Judge.

Argued May 18, 2001--Decided July 10, 2001


   Before EASTERBROOK, MANION, and EVANS,
Circuit Judges.

   EVANS, Circuit Judge.   On November 10,
1992, the Green Bay, Wisconsin, police
department received an anonymous tip that
Keith Kutska, an employee of the James
River Paper Mill, was going to steal a
piece of electrical cord at the end of
his shift. The police passed the tip on
to the company. When Kutska left the mill
that evening, a security guard stopped
him and asked to search his duffel bag.
Kutska refused to permit the search and
left the premises, but he received a 5-
day, unpaid suspension from work for not
letting the guard peek into his bag.

   Kutska was not happy about this, a fact
that quickly became known around the
mill. Later, Kutska learned that the
police were tipped off by the anonymous
call, and he set out to determine who
blew the whistle on him. Fearing
repercussions, the mill worker who
provided the tip, Thomas Monfils, begged
the police not to give Kutska access to
the tape of his call. But, in a
bureaucratic screw-up, Kutska obtained a
copy of the tape with little difficulty.
How Kutska obtained the tape is detailed
in Monfils v. Taylor, 165 F.3d 511 (7th
Cir. 1998), cert. denied, 528 U.S. 810
(1999). We won't repeat here what we said
there. Suffice to say that once Kutska

got his hands on the tape, he immediately identified Monfils as the tipster.

Kutska brought the tape to the mill (on November 21) a few days after he returned from his suspension and played it a number of times for various coworkers, including once for Monfils, who admitted making the call. Michael Piaskowski and Randy LePak, who were with Monfils and Kutska for this tape playing, reacted strongly. On his way out the door after hearing the tape, Piaskowski said, "Geez, Tom, I just fuckin' don't believe you'd do that." LePak was more expressive, telling Monfils, "You can thank your fuckin' lucky stars you didn't do it to me, or I'd have killed you."

News of these events spread quickly throughout the mill. And many workers, around 20 it would appear, eventually heard the tape early that morning. Shortly after 7 a.m., Kutska took the tape to the control room for machine 9 (a/k/a "coop 9") and played it for a group that included the five men with whom he would later be convicted of Monfils' murder: Piaskowski, Michael Hirn, Reynold Moore, Dale Basten, and Michael Johnson. Although Kutska had stolen the electrical cord, he implied that Monfils' accusation was false, and he told Moore and Hirn to "give Monfils some shit" for snitching on a fellow union brother.

Meanwhile, Monfils left his post at coop 7 to perform a periodic task known as "turnover" scheduled for 7:34. A minute later, an altercation involving Monfils and a number of workers occurred near a water fountain (or "bubbler" in Wisconsin parlance) located between coops 7 and 9. Monfils was attacked and seriously injured. He was left, unconscious but alive, lying in a ball on the mill floor. Approximately 5 minutes later, mill worker David Wiener observed Basten and Johnson in an area which connects the paper machines with the vat that supplies pulp to the machines. Johnson was walking backwards, 5 or 6 feet in front of Basten, and they appeared to be carrying something--and on the basis of this evidence, that something was Monfils-- toward a pulp vat.

At 7:45 Kutska and Moore entered coop 7, followed within minutes by Piaskowski.

Kutska told Piaskowski to alert a supervisor that Monfils was missing, purportedly to get Monfils in trouble for leaving his work station. Piaskowski did so and added that there was "some shit going down." A search was begun, and the next day Monfils' body was discovered at the bottom of the vat. A heavy weight, usually kept near machine 7, was tied around his neck. The coroner determined that Monfils died by asphyxiation due to the aspiration of paper pulp.

No charges were immediately filed, and for over 2 years the Green Bay police investigated the crime. A break in the case came in April 1995, when mill worker Brian Kellner,/1 a friend of Kutska's, told police that Kutska, the previous 4th of July, admitted that the six defendants (plus Jon Mineau, who was never charged) confronted Monfils near the bubbler after the 7:34 turnover. Kutska drew a diagram of where each defendant stood and told Kellner that someone slapped Monfils and that Hirn shoved him. Kutska asked "what if" some unidentified person hit Monfils with a wrench or a board. At that point in the assault, Kutska told Kellner that he left the area. According to Kellner, Kutska also stated that mill workers Dennis Servais and Pete Delvoe were present and witnessed the confrontation, but both later denied this to the police. In fact, Delvoe testified that he completed the 7:34 turnover with Monfils but stayed behind to clean the paper machine afterward. Ten to 15 minutes after the turnover, Piaskowski approached Delvoe and asked him if he had seen Monfils.

Kellner relayed Kutska's statement at trial, although at postconviction proceedings he partially recanted andtestified that Kutska identified only himself, Hirn, and Moore as participants in the confrontation. Only one other witness testified about the confrontation--James Gilliam, a jailhouse informant and Moore's cell mate, who repeated what Moore told him. Moore's story, according to Gilliam, was that Kutska, Moore, and unidentified others gathered before the confrontation and decided to scare Monfils. The men from the meeting and unidentified others then confronted Monfils after the 7:34 turnover. Kutska hit Monfils in the face, and then "Mr. Monfils went in a cuddle

just like this and he [Moore] say he just do it like everybody else and he was just came from with his fist over the head . . . ." All participants in and witnesses to the attack, again according to Moore via Gilliam, then went back to work. Moore, according to Gilliam, was later shocked to discover that Monfils was found dead. Based essentially on this evidence, a state court jury convicted Piaskowski and the other five defendants of first degree murder.

In our civil suit opinion in Monfils v. Taylor we affirmed a jury verdict in favor of Monfils' estate against members of the Green Bay police department for their role in releasing the tape which started the chain of events that led to Monfils' death. Today we turn to the criminal conviction of Piaskowski, the defendant against whom, it appears, the State presented the least evidence. After exhausting his direct appeals, see State v. Piaskowski, 1998 WL 644758 (Wis. Ct. App.), review denied, 589 N.W.2d 629 (Wis.), cert. denied, 527 U.S. 1035 (1998), Piaskowski petitioned the federal district court for a writ of habeas corpus, arguing that the record contained insufficient evidence to sustain his conviction. The district court, Judge Myron L. Gordon presiding, granted the writ and forbade the State from retrying him for Monfils' murder. The State appeals from that order and we review it de novo. See Washington v. Smith, 219 F.3d 620, 627 (7th Cir. 2000).

Under 28 U.S.C. sec. 2254(d)(1), as amended by the Antiterrorism and Effective Death Penalty Act of 1996, a prisoner may obtain habeas relief on a claim that was adjudicated on the merits by a state court if that court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." The clearly established federal law applicable to this case is set out in Jackson v. Virginia, 443 U.S. 307, 319 (1979), which holds that due process requires reversal of a criminal conviction if, viewing the evidence in the light most favorable to the prosecution, no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Because the murder in Jackson is

factually dissimilar to the murder of Monfils, we will ignore the "contrary to" clause of sec. 2254(d)(1), see Hennon v. Cooper, 109 F.3d 330, 334-35 (7th Cir. 1997), and confine our inquiry to whether the Wisconsin Court of Appeals' decision (the Wisconsin Supreme Court declined to review the case) that a rational jury could have convicted Piaskowski based on this record resulted from an objectively unreasonable application of Jackson. See Williams v. Taylor, 529 U.S. 362, 409 (2000).

Under the State's theory of the case, Monfils was still alive when he was thrown into the pulp vat, so only Basten and Johnson--who were seen carrying something toward the vat after the confrontation near the bubbler--directly committed the murder. Piaskowski could be found guilty as a party to the crime, however, if he aided and abetted its commission or conspired with others to commit it. See Wis. Stat. sec. 939.05. The State has abandoned its aiding and abetting theory and now relies solely on a conspiracy theory to uphold Piaskowski's conviction.

A conspiracy under Wisconsin law has two elements: (1) an agreement between two or more persons to engage in conduct that will further the commission of the underlying crime, and (2) a conscious intent to realize the criminal objective. May v. State, 293 N.W.2d 478, 483 (Wis. 1980). Although the agreement need not be express, O'Neil v. State, 296 N.W. 96, 102 (Wis. 1941) (tacit agreement sufficient), the State must establish more than Piaskowski's mere presence at the scene of the crime in order to secure a conviction. See State v. Charbarneau, 264 N.W.2d 227, 233 (Wis. 1978).

The State's case against Piaskowski relies almost exclusively on the intersection of the accounts of Kutska and Moore as related by Kellner and Gilliam. Specifically, the State argues that Kellner's trial testimony relaying Kutska's story places Piaskowski at the scene of the assault with the other five defendants. Gilliam, in turn, testified that Moore told him he (Moore) hit Monfils "like everybody else." The State argues that if "everybody" hit Monfils, and Piaskowski was present at the confrontation (as established by Kutska's

confession to Kellner), Piaskowski must have participated in the beating. And having just perpetrated a severe battery, the State goes on, Piaskowski had the same motive as did the others to cover up the crime. The State infers that he did so by agreeing with the others to dump Monfils' unconscious body into the pulp vat.

Putting aside the weighty Sixth Amendment Confrontation Clause problems inherent in the use of the testimony of Kellner and Gilliam against Piaskowski, we are not convinced that their respective stories implicate Piaskowski in Monfils' murder to "a state of near certitude." See Jackson, 443 U.S. at 315. A strong suspicion that someone is involved in criminal activity is no substitute for proof of guilt beyond a reasonable doubt.

As an initial matter, although appellate courts generally are disinclined to evaluate the credibility of witnesses, see Schlup v. Delo, 513 U.S. 298, 330 (1995), we agree with Judge Gordon in the district court that Kellner's account of Kutska's statement is a bit suspect. Both Kutska and Kellner had been drinking on the evening Kutska told his story (Kutska, according to Kellner, had 40 beers!), and many of Kutska's details do not mesh with the facts. For example, Kutska claimed that Mineau participated in the confrontation until Donald Boulanger ordered him away to perform the next turnover, but Boulanger did not confirm this assertion (despite investigators' best efforts to "refresh" his recollection). Although not germane to our review of this record, we note that Kellner recanted a key portion of his trial testimony (especially as it relates to Piaskowski) during postconviction proceedings, claiming that Kutska did not identify any member of the group that confronted Monfils other than himself, Hirn, and Moore. The inconsistencies in Kellner's trial account of Kutska's story render his credibility marginal at best. Indeed, even the state trial judge observed that "a conviction cannot be sustained on the basis of [Kellner's] evidence," and opined that if Kellner's testimony were the only evidence in the case, "the Court would never have allowed [it] to go to the jury."

Nevertheless, we are willing to accept-- as did Judge Gordon--that Kellner's account places Piaskowski near the bubbler at the time the confrontation began. But Kellner's account says nothing about what Piaskowski did or agreed with the others to do. According to Kutska (again, as relayed by Kellner's testimony of his barroom conversation with Kutska 2 years after the murder), Hirn and one or two unidentified members of the group assaulted Monfils. At that point, Kutska told Kellner he left the area, so he offers no knowledge as to what happened next. Thus, Kellner's testimony establishes only that Piaskowski may have been present at the bubbler when Monfils was hit, but given these circumstances, his mere presence is not sufficient, by itself, to sustain Piaskowski's conviction. The jury's conclusion that Piaskowski participated in the beating and/or conspired with the other defendants to kill Monfils is speculation.

The State attempts to fill this gaping hole in its case against Piaskowski with the testimony of the jailhouse witness, Gilliam. According to Gilliam's account of Moore's statement (which on this record is hearsay as to Piaskowski), Kutska first punched Monfils, and then Moore punched and kicked Monfils "like everybody else." Moore did not identify Piaskowski as part of the group that constituted "everybody," however. Indeed, there is no mention of Piaskowski in Gilliam's testimony. Moreover, the statement that Moore beat Monfils "like everybody else" is ambiguous to say the least. One possibility is that, as the State contends, Moore meant that all those present at the confrontation participated in the beating. Equally possible, however, is that Moore meant he beat Monfils in the same manner as everyone else who took part in the beating, which may or may not have included all those present at the scene. The State did not attempt to clarify what Moore meant. Gilliam, of course, could not have shed any light on the intended meaning of Moore's words. Even accepting as fact that Piaskowski was at the scene of the beating, Gilliam's testimony about what Moore told him does not constitute proof beyond a reasonable doubt that Piaskowski played a role in the incident,

either as a direct participant or as a conspirator. No reasonable jury, we think, could have come to a contrary conclusion.

   The State's meager circumstantial evidence against Piaskowski is also innocuous. The fact that Piaskowski was present in coop 9 prior to the beating and entered coop 7 after the beating, 2 or 3 minutes after Kutska and Moore, proves little because Piaskowski spent much of his workday in those areas. The State also makes much of the fact that Piaskowski complied with Kutska's direction to report Monfils missing and added on his own accord that there was "some shit going down." According to the State, the fact that Piaskowski made the report without asking what had happened and added his personal assessment of the situation proves that he was part of a conspiracy to commit the murder. It does no such thing. Monfils was, in fact, mis sing, and as Delvoe confirmed, Piaskowski had been looking for him prior to returning to coop 7. True, a quick-thinking Piaskowski could have been trying to make Delvoe into an alibi witness by asking if he had seen Monfils (when he really knew Monfils was in the vat). This, however, like so much else in this case, is conjecture camouflaged as evidence.

   Neither is Piaskowski's vague reference to "shit going down" illuminating. In fact, it had been an extraordinarily eventful morning, and Piaskowski's statement very plausibly could have been addressing the fact that Kutska was playing the tape of Monfils' call to the police for anyone who would listen, and that many employees who heard the tape-- most of whom were never charged with murder-- were very angry at Monfils. Moreover, even if Piaskowski's call proves he knew about Monfils' fate, it does not prove he was involved in his murder; perhaps he merely witnessed the beating or heard about it secondhand from one of the assailants. In short, the two-stage inference that the "shit going down" was murder, and that Piaskowski's knowledge of the murder necessarily constitutes his participation in it, requires a leap of logic that no reasonable jury should have been permitted to take. Although a jury may infer facts from other facts that are

established by inference, each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation. See United States v. An Article of Device, 731 F.2d 1253, 1262 (7th Cir. 1984); Yelk v. Seefeldt, 151 N.W.2d 4, 9 (Wis. 1967). In this case, the chain of inferences the State attempts to forge fails in multiple places. Piaskowski may have been involved in the attack on Monfils and his murder, but under our system of law, that must be proven beyond a reasonable doubt. The scant evidence here falls short of meeting that burden.

Having determined that no rational jury could convict Piaskowski, little further analysis is required to confirm Judge Gordon's conclusion that the Wisconsin Court of Appeals' decision was an unreasonable application of the law as determined by the Supreme Court in Jackson. The most serious error the court of appeals made is that it found--without reference to any supporting evidence--that Piaskowski "kicked and beat Monfils" during the confrontation near the bubbler. If the evidence supported this assertion, we would agree that a rational jury could have convicted Piaskowski and that an appellate court reasonably could have affirmed his conviction. As we have discussed, however, the record is devoid of any direct evidence that Piaskowski participated in the beating of Monfils, and the available circumstantial evidence at most casts suspicion on him. This is a far cry from guilt beyond a reasonable doubt. Accordingly, we affirm the district court's decision to issue the writ of habeas corpus.

Anticipating the possibility of our ruling today, the State requests permission to retry Piaskowski under the theory that he conspired with the other defendants to beat Monfils and Monfils' death was a natural and probable consequence of the beating. Under Wisconsin law, a conspirator is responsible for any crime committed as a natural and probable consequence of the intended crime. Wis. Stat. sec. 939.05 (2)(c). Piaskowski, of course, objects to any subsequent trial on the ground that the Fifth Amendment's Double Jeopardy Clause bars retrial for the same offense after an appellate court has reversed a conviction based on insufficiency of the

evidence. See Burks v. United States, 437 U.S. 1, 18 (1978).

This court and others have carved out a narrow exception to the rule established in Burks, however. In United States v. Lanzotti, 90 F.3d 1217 (7th Cir. 1996), a number of defendants who leased video poker and video slot machines to taverns were charged with participating in an illegal gambling business. One element of the federal offense was violation of a state law, which in Lanzotti was an Illinois statute that outlawed "[p]lay[ing] a game of chance or skill for money" and "bargain[ing] for the sale or lease of . . . any gambling device." 720 ILCS 5/28-1(a)(1), (3). The government initially proceeded under the theory that the defendants violated both subsections of the Illinois statute, but during trial, prosecutors inexplicably abandoned any argument that the defendants had leased gambling devices. In accordance with the government's strategy, the jury was instructed only on the "playing a game of chance" subsection of the statute. After the jury returned a guilty verdict, the district court granted a new trial, finding--as the government then conceded--that the evidence did not support the conclusion that the defendants had "played a game of chance" within the meaning of the first subsection of the statute.

Lanzotti and his codefendants were reindicted for the same offense, this time on the theory that they had aided and abetted others (the tavern patrons) in "playing a game of chance." On appeal from the denial of their motion to dismiss on double jeopardy grounds, we held that the trial court's grant of a new trial was not the functional equivalent of an acquittal. Id. at 1222. A new trial was granted because the jury had been instructed on a theory of the offense inapplicable to the defendants' conduct, a so-called "trial error," not because the defendants were factually innocent. Id. Because the government had introduced overwhelming evidence of the defendants' guilt under the aiding and abetting theory (as well as under the second subsection of the Illinois statute), we held that the Double Jeopardy Clause would not prohibit a second trial under the correct legal theory. Id.

Unlike the defendants in Lanzotti, there is scant evidence in the record in this case that supports Piaskowski's guilt under the State's new legal theory. In fact, our analysis today of the evidence allegedly establishing Piaskowski's participation in a murder conspiracy applies equally to his alleged participation in a beating conspiracy. Thus, unlike the Lanzotti trial court's grant of a new trial, our decision today is the functional equivalent of an acquittal, at least with respect to the State's belated "natural and probable consequences" theory. Under Burks, therefore, the State may not retry Piaskowski for Monfils' murder without offending the Double Jeopardy Clause.

For these reasons, the district court's order issuing a writ of habeas corpus is AFFIRMED.

FOOTNOTES

/1 Kellner was deer hunting, and not at work, when Monfils was killed.