In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-1497

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

TERRANCE JONES,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:10-cr-00096-4—**Joan B. Gottschall**, *Judge.*

ARGUED DECEMBER 3, 2012—DECIDED APRIL 9, 2013

Before WOOD and HAMILTON, *Circuit Judges*, and
DARROW, *District Judge*.[*]

HAMILTON, *Circuit Judge.* We have often said that after
a guilty verdict, a defendant seeking a judgment of ac-
quittal faces a "nearly insurmountable hurdle," *e.g.*,
*United States v. Moore*, 115 F.3d 1348, 1363 (7th Cir. 1997),

[*] The Honorable Sara Darrow of the Central District of Illinois,
sitting by designation.

but the height of the hurdle depends directly on the strength of the government's evidence. The Constitution requires the government to prove guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 313-14 (1979). If a reasonable jury could not find guilt beyond a reasonable doubt, the court may not enter judgment on a guilty verdict.

A jury found Terrance Jones guilty of possessing cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and of using a telephone to facilitate possession of cocaine with intent to distribute in violation of 21 U.S.C. § 843(b). Jones moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. The district court granted Jones' motion, concluding that "the inferences the jury had to draw in order to reach a guilty verdict fall into the realm of impermissible speculation." *United States v. Jones*, 2012 WL 366893, at *12 (N.D. Ill. Feb. 1, 2012). The government has appealed and asks us to reinstate the jury verdict. We affirm the district court's judgment. We agree with the district court that the government's circumstantial case against Jones simply required too much speculation to support a guilty verdict beyond a reasonable doubt.

I.  *Jurisdiction and Standard of Review*

We have jurisdiction to consider this appeal under 18 U.S.C. § 3731 and 28 U.S.C. § 1291. We review *de novo* the grant of a Rule 29 motion. *United States v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009). The district court properly grants such a motion when the "evidence is

insufficient to sustain a conviction." Fed. R. Crim. P. 29(a), (c). When reviewing the sufficiency of the evidence, we ask "whether, after viewing the evidence in the light most favorable to the government, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *Presbitero*, 569 F.3d at 704. The inquiry does not ask what we would have decided if we were on the jury. We need not be convinced by the evidence ourselves. Our inquiry is whether a reasonable jury considering the evidence in the light most favorable to the government could have found each element of the offense beyond a reasonable doubt. *United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009).

The government's case against Jones was entirely circumstantial. No witnesses testified that they saw Jones in possession of any cocaine, and the intercepted telephone calls that the government relies upon were not tied directly to actual or constructive possession of any cocaine. Entirely circumstantial cases are not unusual, of course, and they certainly can provide constitutionally sufficient proof beyond a reasonable doubt. "A verdict may be rational even if it relies solely on circumstantial evidence." *Moore*, 572 F.3d at 337. In such cases we, like the district court here, must carefully consider each inference necessary to prove all elements of the offense. We do not suggest that there is a bright line between reasonable and unreasonable inferences from circumstantial evidence, but there is a line. The government may not prove its case, as we have said, with "conjecture camouflaged as evidence." *Piaskowski v. Bett*, 256 F.3d 687, 693 (7th Cir. 2001).

A Rule 29 motion calls on the court to distinguish between reasonable inferences and speculation. Each step in the inferential chain must be supported by evidence that allows the jury to "draw reasonable inferences from basic facts to ultimate facts." *Coleman v. Johnson*, 566 U.S. ___, ___, 132 S. Ct. 2060, 2064 (2012). "Although a jury may infer facts from other facts that are established by inference, each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation." *Piaskowski*, 256 F.3d at 693. We "will overturn a jury verdict for insufficiency of the evidence only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Stevenson*, 680 F.3d 854, 855-56 (7th Cir. 2012).

## II.   *The Government's Theory of the Case and the Trial Evidence*

The government's case against Jones arose from an investigation of Dominique Finley's drug organization in Chicago. In 2008, the Federal Bureau of Investigation and the Chicago Police Department began investigating Finley's drug organization using physical surveillance, controlled buys using confidential informants, and eventually Title III wiretaps. The affidavit seeking authority for the Title III wiretaps did not identify Jones as a target or person of interest in Finley's organization. Tr. 246-49.

The investigation showed that Finley led an extensive drug conspiracy. The government eventually indicted

Finley and several of his cohorts on multiple charges arising from the conspiracy. Jones, however, was not charged or indicted as a part of the overarching conspiracy. He was charged only with two specific offenses based on the events of one day: June 17, 2009. He was charged with possession of cocaine with intent to distribute and with use of a telephone to facilitate that possession. The government's case against Jones focused exclusively on the events of June 17, 2009.

The government's theory was that Finley had obtained a kilogram of powder cocaine early in the day on June 17, 2009. He then met with an undercover government informant who asked to buy 63 grams of crack cocaine. Based on this order, the government argued, Finley needed someone to "cook" some of the cocaine into crack cocaine so that he could complete the sale to the confidential informant.

The government's theory was that Finley telephoned both his regular "cooker," Clarence Johnson, and Jones to see if either or both would cook the cocaine for him. The government argued that its interpretation of two recorded telephone conversations between Jones and Finley, detailed below, showed that Jones agreed to cook the cocaine. From there, the government argued that Jones' comings and goings throughout the day, as well as his exit from a particular residence at 1447 South Christiana with Finley, proved beyond a reasonable doubt that Jones cooked the cocaine for Finley inside the South Christiana residence.

No witness testified that Jones cooked any cocaine or was ever in possession of any cocaine. The surveillance team saw Jones exit the residence with Finley and then get into Finley's car with him. The surveillance team had not seen Jones enter the South Christiana residence. After their exit, police attempted to stop Finley's car. Finley tried to escape, and the police started a chase. Police officers saw Finley throw a bag from the car. The bag was recovered and turned out to contain crack cocaine. The police in pursuit eventually forced Finley to stop the car. Finley ran away on foot; Jones remained with the car. Finley was caught, but the police later allowed both men to leave the scene. The government does not contend that Jones had actual or constructive possession of the crack cocaine that Finley threw from his car.

Since this case turns on whether the inferences leading to a guilty verdict based on circumstantial evidence were reasonable or speculative, we must review the government's evidence in detail. The government argued that the telephone conversations and surveillance of both Jones and Finley showed that Jones (1) purchased the necessary chemicals and gathered the necessary supplies and utensils to cook the cocaine, and (2) then actually cooked the cocaine for Finley at the South Christiana residence. At trial, the government presented tapes and transcripts of the conversations intercepted by the wiretap on Finley's telephone, testimony from two of Finley's co-conspirators, and testimony from law enforcement officers who conducted surveillance of Finley.

Finley and Jones first spoke at 2:00 p.m. on June 17, 2009. The conversation went as follows:

Jones:   What up, cuz?

Finley:   Where you at?

Jones:   I'm on Concord.

Finley:   Doin' somethin'?

Jones:   What you say?

Finley:   Doin' somethin'?

Jones:   Yeah, yeah, at all times, at all time.

Finley:   Get this punk out a here, man. I need you, man.

Jones:   Okay. I'm always available for my family, man, even though you treat me like shit. I'm on Concord, where you at?

Finley:   I'm gonna come that way, man on the real. I need uh, I need you uh, to do that what you done for Sonny for me.

Jones:   Come bend on me, Joe, you on yo' way?

Finley:   Yeah.

Doc. No. 298, Call No. 5881. The government argued that this telephone conversation formed the basis for the charge of using a telephone to facilitate possession with intent to distribute, arguing that the jury could reasonably infer from Finley's reference to "Sonny" that Jones had cooked crack for Sonny in the past. The government did not present any evidence as to who Sonny

was or what Jones might have done for him in the past. The government argued to the jury that this conversation "got things rolling." Tr. 558, 592.[1]

At 2:20 p.m., police officers saw Finley inside his parked car talking to Jones, who was outside the car. At 2:35 p.m., Finley called Johnson, his regular cooker. At trial, Johnson testified that he had cooked crack for Finley in the past and that Finley called him on June 17 to ask him to cook for him. This conversation was intercepted by the wiretap and presented to the jury. See Doc. No. 298, Call No. 5409. Johnson and Finley then met at Finley's grandmother's house where, Johnson testified, Finley again asked Johnson to cook for him. Johnson said he made up an excuse not to do it because he did not want to cook for Finley on that particular day.

At 2:45 p.m., Finley spoke with Eric Ollison on the telephone and asked for a "computer," which a police officer testified is a code word among drug dealers for a scale to weigh drugs. See Doc. No. 298, Call No. 5892. Ollison and Finley arranged to meet each other at a park. This conversation was presented to the jury as well. See Doc. No. 298, Call No. 5894.

Returning the focus to defendant Jones, the wiretap intercepted a series of calls between Finley and Jones from 3:24 to 3:26 p.m.:

---

[1] The government originally charged Jones with another count of use of telephone to facilitate possession with intent to distribute based on a later conversation but dropped that charge before trial. Doc. No. 188.

Jones:    Yo, what up cuz.

Finley:   Say when you say I can get that from uh,
          Walgreens or somethin'?

Jones:    Yeah, you ready?

Finley:   I just asked you a question, man.

Jones:    Yo, I'm takin' you where you gotta go, man,
          'cuz I'm handlin' this. So what's up?

Finley:   C'mon, man, yes or no, man. Goddamn, big
          homey, I ain't never known a mother fucker
          that can't ask a simple question though, man.

Jones:    Uh, Walgreens don't got it Joe.

Finley:   That what I'm trying to see though, CVS or
          somethin'.

Jones:    [Unintelligible] at the crib?

* * * *

Finley:   I just ask you do you know where CVS at,
          man?

Jones:    I don't know where CVS, and they don't got
          'em either, Joe. [Unintelligible] and tell me
          fuck me and I will tell you where they at,
          Joe. Cause I don't like this type a shit.

Finley:   Man Joe all bullshit aside man. C'mon, man.
          Just said I'm tryin' to get back witcha and
          I'm tryin' find some, man. You treat me
          like that. This is where it's at, man. You
          doin' somethin' man and I ain't got time to

[unintelligible] dick around at all these places, man.

Jones:     Okay I'm fittin' to do it for you. Go, go get it from Walmart.

Finley:    You say the Walmart?

Jones:     Yeah.

Finley:    Thank you, man. Damn.

Jones:     You don't know which one though.

* * * *

Jones:     [Unintelligible] man. You need me.

Finley:    Man, get up off my line man, I just asked you a simple question, take that long to answer, man.

Jones:     I was tellin' you I'm tryin' to knock it out for you though, Joe.

See Doc. No. 298, Call Nos. 5903-05. The government argued to the jury that these conversations show that Jones and Finley were involved in a joint venture to obtain chemicals and equipment to cook powder cocaine into crack.

Finley was next observed by police at 3:52 p.m. Officers saw Jones approach Finley and get into his car. The two drove off together but the police did not follow them. At trial, an officer testified that a CVS, Wal-Mart, and Walgreens were all in the area, but he did not offer any testimony that he saw Finley or Jones enter or leave any of those stores.

At 4:06 p.m., police saw Finley (but not Jones) outside a residence in the 5900 block of West Huron Street with a different unidentified man who was holding a bag. At 5:00 p.m., police saw Finley and Jones driving in Finley's car westbound on Douglas Boulevard. The police next saw Finley's empty car parked at the corner of 15th and Christiana.

Around 5:15 p.m., police saw Finley exit the residence on South Christiana. Between 5:13 and 5:32 p.m., Finley and Jones had another series of calls. The first was at 5:13 p.m.:

> Jones:   What up, cuz?
>
> Finley:   Hey to 16th and Ridgeway right quick and pick my girl up. She gonna walk to the corner.
>
> Jones:   Alright. She out there right now?
>
> Finley:   Yeah, she fittin' to walk up there right now.
>
> Jones:   Alright.
>
> Finley:   16 and Ridgeway.

Doc. No. 298, Call No. 5916. The next call occurred at 5:21 p.m.:

> Jones:   Yo.
>
> Finley:   You down there?
>
> Jones:   [Unintelligible] I'm right around the corner from you.
>
> Finley:   I didn't hear you.

Jones:  I said I'm right around the corner from you [unintelligible], so she can find them, find the blender for me.

Finley:  She ain't found it yet?

Jones:  No, we lookin' for it now. My cousin, who crib this is, she gonna walk around the corner. I'm right on the next block from you. Your girl ain't got [unintelligible] she can't bring [unintelligible]?

Finley:  I don't know if she got no blender, man.

Doc. No. 298, Call No. 5922. The next call was at 5:24 p.m.:

Finley:  Hey, Homey.

Jones:  What she say?

Finley:  She ain't got no blender, man.

Jones:  Alright, we get one from my other cousin right here. Tyretta, ho, ho, man. I'm like here on the next block tryin' to get a blender. I got this, just chill.

Finley:  C'mon man.

Jones:  Come on Joe, oh my momma don't start whinin', Joe.

Finley:  'Cuz you supposed to have all this, man. How you gonna come to me. Man, you ain't got nothin' here, man.

Jones:  I got, I told you I had the blender. I just didn't have the pieces. I didn't know that

'cuz I ain't did nothin'. You see I got the blender. I thought I had the pieces.

Finley: Why don't you just go grab her first, man, 'cuz she's sittin' right there on the corner, man.

Jones: That's all on your mother fuckin' mind. Money don't matter to you.

Finley: C'mon, man, if I knew all this, man, I would a just, man, stayed where I was, though, man, 'cuz you ain't got nothin' here, man.

Doc. No. 298, Call No. 5927. Their next calls occurred between 5:28 and 5:29 p.m.:

Finley: Damn.

Jones: I'm on my way to your girl now, man. What she on the corner supposed to be two blocks away.

Finley: Yeah, man.

Jones: MOB, man. MOB.

* * * *

Jones: Where your girl at, man?

Finley: What?

Jones: I'm on 16th and Ridgeway, man. I don't see your girl.

Doc. No. 298, Call Nos. 5929-30. At 5:32 p.m. Finley and Jones spoke again:

Finley:     Big Homey, what you just say?

Jones:      I'll holler at chu.

Finley:     Did you get that?

Jones:      That's mandatory. I got that first.

Doc. No. 298, Call No. 5935.

At 5:30 or 5:45 p.m., officers saw Finley return to 1447 South Christiana with an unidentified woman. Neither was seen carrying anything into the house. Within the hour, a Buick dropped off a second unidentified woman who approached the residence, might have entered, and then quickly returned to the Buick and drove away. At trial, the officer responsible for surveilling the South Christiana residence was unable to pinpoint the exact time he saw Finley enter the South Christiana residence, testifying that it was "Approximately 5:30, 5:45 somewhere in that neighborhood." Tr. 337.

Officers did not see Jones enter 1447 South Christiana and did not know how long he was actually inside the residence. At 6:30 or 6:45 p.m., officers saw Finley, the first woman, and Jones exit the residence, get into Finley's car, and drive southbound on Christiana toward 16th Street. Finley and Jones dropped the woman off and continued driving. At trial, the officer doing surveillance was unable to testify to the exact time he saw Jones and Finley exit the residence at South Christiana. He testified that it was, "probably around the area of like 6:30, 6:45. I don't have the times committed to mem-

ory." Tr. 338.[2]

At 7:00 p.m., officers attempted a traffic stop on Finley's car. Finley tried to evade the police, who pursued him. During the chase, Finley threw a clear plastic bag out of his car window. It landed in an alley where police officers later found it. Finley finally stopped the car and ran away, but an officer eventually caught him. Jones got out of the car but did not attempt to flee. Both Finley and Jones were allowed to leave the scene without arrest.

The bag Finley threw out the window contained 86.8 grams of crack cocaine packaged in portions ranging from 3 to 25 grams. The cocaine was adulterated with sodium bicarbonate and a chemical used by veterinarians. There were three latent fingerprints on the bag, but none belonged to Jones. The bag of cocaine was the only physical evidence presented by the government against Jones.

---

[2] These were not the only instances in which the surveillance team was unable to provide precise times of Jones' and Finley's movements, although these details were important for the government's case. The district court noted this troubling weakness in at least two other instances, commenting that the officer's "testimony on direct examination as to precise times was often vague, and only through the testimony elicited by Jones' counsel on cross-examination is the court able to pinpoint with any certainty when certain events took place." *United States v. Jones*, 2012 WL 366893, at *5 n.5 (N.D. Ill. Feb. 1, 2012).

At 7:32 p.m., Finley contacted Ollison and told him to meet him at the park. Ollison testified that he could tell by Finley's voice that something was wrong. He also testified that at the park, Finley told him that the police had chased him and he had thrown his drugs out the window. Tr. 484. In a later conversation, Finley asked Ollison to go back and look for the drugs he had thrown in the alley. Ollison told Finley that he would go back and look but he did not know what part of the alley to search. Finley also told Ollison that the police were still around watching.

The following calls were intercepted by wiretap when Jones was with Ollison looking for the crack and talked to Finley on the telephone. At 8:19 p.m.:

> Jones:  We fittin' to double back, Joe.
>
> Finley:  Double back where?
>
> Jones:  Over there. You know what I'm sayin'? We thought you, you know what I'm sayin'? You know? [Unintelligible]
>
> Finley:  I just called him and told him, man.

Doc. No. 298, Call No. 5988.

At 8:24 p.m., Ollison called Finley, and at some point during the conversation, Jones took the telephone and began talking to Finley. The government relies most heavily on Jones' "weeped us" comment in the transcript of that call:

> Finley:  Yeah.
>
> Ollison:  Where you at?

Finley:    Over here by the P.

Ollison:   By the P?

Finley:    Yeah.

Jones:     I, I think Homey and them weeped us, Joe.
           Remember we walked pass Homey and them
           by that alley, 'cuz I just, we went back there
           and tore it up, Joe. And, we didn't give a
           fuck, Joe. You know what I'm sayin'?
           Homey done weeped us, Joe. 'Cuz they,
           where they hangin' at they could see a
           straight shot, when we walked past them
           by the alley, I'm like, man let's go this way.
           I think they weeped us, Joe. They had to,
           man, 'cuz they right there too deep. You
           know what I'm sayin'?

Finley:    Right, right. I think they peeped us too
           though on the real, 'cuz they was on that
           other block too.

Jones:     Right, right, yeah. They, they let their people
           know we just tore that mother fuckin' thing
           up, man. You know what I'm sayin'? That
           little bushes all that shit. You know big ass
           white bag ain't, ain't hard to miss, man.

Finley:    Come over, here. I'm gonna tell y'all what
           all over here.

Jones:     Alright.

Doc. No. 298, Call No. 5991. The government argues
that the jury could reasonably infer from Jones' use of

the word "us" in the phrase "weeped us" that he partici-pated in cooking Finley's crack and that use of the plural "us" implied joint ownership and possession of the crack.

The last call that day occurred at 11:31 p.m. between Ollison and Finley. Finley asked Ollison if Jones might have stolen his drugs. Ollison assured him that Jones did not. See Doc. No. 298, Call No. 6027.

III. *Legal Analysis*

A. *The Charged Offenses*

To prove possession of a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1), the government had to present evidence sufficient to show beyond a reasonable doubt that Jones knowingly and intentionally possessed a controlled substance with intent to distribute it to another person. *United States v. Campbell*, 534 F.3d 599, 605 (7th Cir. 2008). The govern-ment's theory is that Jones possessed the cocaine inside the South Christiana residence, where the government believes he cooked powder cocaine into the crack that Finley took with him in the car. (The government did not try to prove that Jones had joint possession of the cocaine when he was in the car with Finley.)

To prove the use of a communication facility in causing and facilitating possession of a controlled sub-stance with intent to distribute in violation of 21 U.S.C. § 843(b), the government had to prove beyond a rea-sonable doubt that (1) either Jones or Finley committed

the underlying possession offense, and (2) Jones knowingly and intentionally used a telephone to facilitate that possession. *United States v. McGee*, 408 F.3d 966, 985 (7th Cir. 2005) (explaining that "the government must prove the commission of the underlying offense to obtain a conviction on a charge of telephone facilitation") (citation omitted); *United States v. Mueller*, 112 F.3d 277, 281-82 (7th Cir. 1997) ("[A] defendant cannot be convicted of using a telephone to facilitate a drug offense unless the defendant also aids or abets, or attempts to commit, the drug offense itself."). The government relies on the first intercepted call between Finley and Jones on June 17, when Finley said he needed Jones to "do that what you done for Sonny for me."

The government was not required to prove its case with direct evidence, of course, such as a witness who saw Jones cooking crack cocaine or handing a package to Finley. The question is whether the circumstantial evidence allows a reasonable conclusion, beyond a reasonable doubt, that Jones possessed cocaine with intent to distribute it and/or used a telephone to commit the unlawful possession or to help Finley do so.

B. *The Inferential Chain*

We start with the common ground. Based on Finley's recorded conversations with the confidential informant during the controlled buy, as well as police surveillance of Finley, it was reasonable to infer that Finley had a kilogram of powder cocaine on June 17, 2009. Based on the same evidence, it was also reasonable to infer that

Finley wanted to cook that cocaine into crack at some point that day. Based on this evidence and the bag of crack recovered by law enforcement, it was also reasonable to infer that Finley did in fact successfully convert some or all of his cocaine into crack at some point on June 17, 2009. But all of these reasonable inferences support a case against Finley, not Jones.

No witness saw Jones in possession of the crack at any time. No witness heard Jones admit that he had possessed the crack or that he had helped Finley cook the cocaine. The government was unable, through its extensive surveillance, to establish how long Jones was inside the South Christiana residence or whether there was crack inside that residence. Given this lack of direct evidence, the government asked the jury to make several inferences based on conversation and movement.

The line between reasonable and speculative inferences of this nature is by no means a sharp one. Each inference must be examined closely to ensure that mere presence or association with criminal activity is not being used to infer guilt. Though the government criticized the district court for carefully considering each individual inference, that is exactly what is required in these unusual cases. The district court appropriately considered each inference in isolation, and then went on to evaluate the cumulative effect of the inferential chain.

Inferences cannot be motivated by or made possible by speculation focused on a defendant's presence

or association with criminals or their criminal activity. *Piaskowski v. Bett*, 256 F.3d 687 (7th Cir. 2001), is instructive on the line between reasonable inferences and speculation. In *Piaskowski*, we affirmed a writ of habeas corpus overturning a state court jury verdict based on circumstantial evidence. Piaskowski was convicted of murdering his co-worker, Thomas Monfils, at a paper mill. 256 F.3d 687 (7th Cir. 2003). The evidence against Piaskowski included a mill worker's testimony describing a diagram drawn by a fellow mill worker showing six people, including Piaskowski, standing around the water cooler where Monfils was attacked. Piaskowski was also reported as having said on the morning of the murder that "shit was going down." A different mill worker also testified that a friend told him that the friend had beaten Monfils at the water cooler "like everybody else." *Id.* at 689-91.

Based on these three pieces of evidence, the state asked the jury to believe the following inferential chain: (1) The diagram proved that Piaskowski was present at the water cooler when Monfils was attacked. (2) The description of a different mill worker having beaten Monfils "like everyone else," meant that "everyone" represented in the diagram at the water cooler had beaten Monfils. (3) Therefore, Piaskowski participated in beating Monfils and thus aided and abetted his murder. The state had argued that Piaskowski's statement that morning that "shit was going down" was a direct reference to the attack on Monfils. *Id.* at 689-93.

We considered each inference and found them to be impermissibly speculative, holding that a "strong suspi-

cion that someone is involved in a criminal activity is no substitute of guilt beyond a reasonable doubt." *Id.* at 692. We found that the evidence could not support a reasonable finding of guilt because it could not satisfy the "state of near certitude" required by *Jackson v. Virginia*, 443 U.S. 307 (1979). *Id.* Even if we assumed that Piaskowski was at the water cooler, we held that "his mere presence is not sufficient, by itself, to sustain [his] conviction. The jury's conclusion that Piaskowski participated in the beating and/or conspired with the other defendants to kill Monfils is speculation." *Id.*

We recognized that Piaskowski might well have been involved in Monfils' murder. We did not deny the high level of suspicious activity and circumstantial evidence piling up against Piaskowski. We addressed this uncomfortable situation head on: "In this case, the chain of inferences the State attempts to forge fails in multiple places. Piaskowski may have been involved in the attack on Monfils and his murder, but under our system of law, that must be proven beyond a reasonable doubt. The scant evidence here falls short of meeting that burden." *Id.* at 693. We have a similar responsibility today, even if we have similar suspicions regarding Jones' involvement with Finley's drug trafficking. Regarding Jones' involvement, the district judge identified several unreasonable inferences that persuaded her to grant the Rule 29 motion. We turn to those now.

a.   The *2:00 p.m. Call Between Jones and Finley*

The district court found it unreasonable to conclude that the 2:00 p.m. call between Jones and Finley showed an agreement between the two that Jones would cook powder cocaine into crack for Finley. In particular, the district court took issue with the inference the jury needed to make regarding Finley's reference to "Sonny." To conclude, based on that conversation, that Jones agreed to cook crack for Finley, the jury would have to know what Jones had done for Sonny in the past. The government presented no evidence regarding who Sonny was or what, if anything, Jones had done for Sonny in the past. We cannot fill these gaps by guess-work. In addition, Ollison testified that Finley never told him that Jones helped Finley cook crack on June 17, 2009 or that Jones was helping Finley distribute crack.

In a hearing, the district court pressed the government to explain why the 2:00 p.m. call showed that Jones agreed to cook for Finley. The government relied on the evidence that Finley had powder cocaine, Ollison's statements about Finley wanting a scale, and Johnson's testimony that Finley had needed to cook that afternoon and that Johnson had refused. Doc. No. 291 at 7. All of these facts support the rational inference that Finley needed someone to cook his cocaine, but none of these facts relate directly or circumstantially to Jones. Based on this evidentiary void, the district court found that the inference that Jones agreed to and then did cook Finley's cocaine into crack was speculative. We agree.

### b. *Jones' Presence at and Exit from 1447 South Christiana*

The district court also rejected as speculative the government's argument to the jury that Jones was inside the residence at 1447 South Christiana for ninety minutes cooking Finley's cocaine into crack cocaine. The government calculated the ninety-minute period from the telephone calls between Finley and Jones, which ended at 5:32 p.m. (Call No. 5935) and coincided with Finley's entry into the house, and the stop of Finley and Jones in Finley's car at approximately 7:00 p.m.

Yet the telephone calls clearly establish that for some portion of that ninety-minute period Jones was not inside the residence but was instead running around town, probably doing some sort of unidentified errands for Finley. The police did not see Jones enter the residence. They saw him leave sometime between 6:30 and 6:45 p.m. Despite all of this, the government repeatedly argued that Jones and Finley were inside the residence for ninety minutes cooking crack. Tr. 187-88, 561-64.[3]

Jones was present inside the house for some unidentified period of time, but just how long is entirely unclear, and his presence alone adds little to the case. "Mere

---

[3] On appeal the government argues that one hour is enough to cook the crack. There was no testimony or evidence presented at trial regarding how long it takes to cook powder into crack cocaine and prepare it for distribution, which would include drying and packaging. The government's argument on appeal, untested by cross-examination, cannot substitute for evidence on the point.

proximity to the drug, mere presence on the property where it is located, or mere association, without more, with the person who does control the drug or the property on which it is found, is insufficient to support a finding of possession." *United States v. DiNovo*, 523 F.2d 197, 200-01 (7th Cir. 1975) (internal citation omitted). The district court carefully examined whether the government had in fact presented more beyond Jones' mere presence in 1447 South Christiana and his association with Finley. The government did not present any evidence showing that there was any cocaine present in the residence. The district court concluded that the jury could have concluded that Jones cooked Finley's cocaine only by crossing "the line between what inferences the evidence supports and what is more in the realm of mere suspicion." Doc. No. 291 at 30. We agree.

Jones was never seen with cooking utensils or diluents at any point during the day. He was not seen on the grounds of a CVS, Wal-Mart, or Walgreens where one might purchase such ingredients. He was not seen entering 1447 South Christiana, nor was it clear how long he was inside. No one was seen entering 1447 South Christiana carrying ingredients or utensils to cook the crack. None of the intercepted telephone conversations showed an agreement between Jones and Finley to have Jones cook the cocaine.

The government relied heavily on Jones' statements regarding the search for a blender and FBI testimony at trial that a blender can be used to cook crack. This

cannot carry the case. Johnson testified at trial that he and others typically did not use a blender to cook cocaine, and no one ever saw Jones or Finley in possession of a blender. For the jury to infer, therefore, based on the evidence presented that Jones cooked Finley's cocaine, they would have to speculate that Jones did so based on his association with Finley and his presence at 1447 South Christiana. That speculation would reach too far and would not satisfy the high bar of proof beyond a reasonable doubt.

The jury could not reasonably infer beyond a reasonable doubt, based on presence or association, that the defendant possessed cocaine on June 17, 2009. We have made this point before when affirming a Rule 29 acquittal. In *United States v. DiNovo*, the defendant was convicted of possessing heroin with intent to distribute based on the fact that large amounts of heroin and money were found inside the trailer home where she lived with her husband. The drugs were discovered after the DEA executed a search warrant. We found the evidence insufficient to establish the wife's constructive possession because the government offered no evidence to show that the drawers where the heroin and money were found were in parts of the trailer where she kept her belongings. "At best the evidence showed that she was married to Myron DiNovo and lived in the trailer with him." 523 F.2d at 201. This reasoning is persuasive in this even weaker case; the government could not establish that any drugs were actually present in 1447 South Christiana in the first place.

c.  *Jones' Return to Look for Crack in the Evening*

The government's wiretap evidence can support a reasonable finding that Jones went back in the evening to look for the bag of crack that Finley had thrown from the car. That falls well short of supporting the government's theory that Jones possessed and cooked cocaine in the South Christiana residence. Ollison testified that when Jones rode with him to the alley, he never said that he had cooked cocaine for Finley. Tr. 505. Johnson testified that he had never seen Jones cooking cocaine. Tr. 271-72. There was no evidence, as the government acknowledged, that Jones had ever cooked crack for Finley or that he had done so in the past.

The government relies heavily on the statements Jones made on the telephone to Finley when he was looking for the missing bag: "I, I think Homey and them weeped us, Joe. Remember we walked pass Homey and them by that alley, 'cuz I just, we went back there and tore it up, Joe. And, we didn't give a fuck, Joe. You know what I'm sayin'? Homey done weeped us, Joe." Doc. No. 298, Call No. 5991. The government argues that the mystifying ambiguity in "weeped" was irrelevant and that the probative clue in the statement was "us." The government argues that Jones' choice of the word "us" implied that he and Finley were engaged in a joint venture to distribute crack.

That is a possible interpretation, but the district court had several problems with this argument, as do we. First, as the district court suggested, it is quite possible that "weeped" was transcribed incorrectly and that Jones

in fact said "peeped," as Finley said in reply to him. See Doc. No. 298, Call No. 5991. The statement would then seem to indicate only that Jones recognized the police or that someone else, perhaps rivals of Finley's drug operation, had seen Jones and Finley earlier that day. To infer from this that Jones cooked crack for Finley would again endorse the impermissible inferences of guilt by association or mere presence.

In *Piaskowski*, we recognized that interpreting testimony that one mill worker had beaten the murder victim Monfils "like everyone else" to mean that everyone at the water cooler, including Piaskowski, had beaten Monfils, was a possible interpretation. We were troubled there and are troubled here, however, by the extent to which a possible interpretation or over-interpretation of an ambiguous statement is being used with little support to show guilt beyond a reasonable doubt. *Piaskowski*, 256 F.3d at 692-93.

To sum up, we agree with the district court's conclusion that the evidence was not sufficient to allow a reasonable jury to find the defendant guilty beyond a reasonable doubt on the charges and theory presented at trial.

C. *Aiding-and-Abetting Theory*

On appeal, the government has argued for the first time that it would have been reasonable for the jury to find Jones guilty on the theory that he aided and abetted Finley's efforts to possess crack cocaine with the intent to distribute it. This new argument is based on the tele-

phone calls in which Jones and Finley discussed purchasing something at a drugstore and Jones' effort to locate a blender. Gov't Br. at 38-39. The district court gave the jury an aiding-and-abetting instruction, but the government never argued this theory to the jury during the trial or to the district court in the briefs and arguments on the Rule 29 motion. See Tr. 616.

The government argues that its failure to raise this argument before the district court is at worst forfeiture and that we should apply plain error review to the new argument. Jones argues that the government waived this argument because it made a strategic decision not to argue the aiding-and-abetting theory to the jury or the court because it would have undermined the government's main theory, that Jones actually cooked the crack for Finley.

Waiver involves the intentional abandonment of a known right and precludes appellate review of the issue. *United States v. Turner*, 651 F.3d 743, 747 (7th Cir. 2011). Forfeiture occurs when a party "negligently bypasses a valid argument." *United States v. Anderson*, 604 F.3d 997, 1001 (7th Cir. 2010). While Jones' waiver argument has considerable force, we need not choose between waiver and forfeiture because the government has not shown plain error.

Establishing plain error requires showing that the error "affects a substantial right, and, moreover, impacts 'the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Allen*, 529 F.3d 390, 395 (7th Cir. 2008), quoting *United States v. Olano*, 507 U.S. 725, 732

(1993). The government has failed to identify exactly what substantial right is affected here. We suspect this is not a simple oversight. Claims of plain error are usually raised by a defendant, who can point to many rights that an egregious error can affect. The government, however, finds itself in a very different position.

It is not obvious that the government should ever be able to invoke plain error. In *United States v. Jackson*, 207 F.3d 910 (7th Cir. 2000), *vacated on other grounds*, 531 U.S. 953 (2000) though, we applied plain error to a sentencing guideline error that had drawn no objection from the government, perhaps because the district court had given no advance notice that it was considering the issue before it decided it. Judge Wood dissented in relevant part, explaining her "grave reservations about the proposition that the government has the right to invoke the plain error doctrine to avoid the consequences of its own oversights." *Jackson*, 207 F.3d at 922 (Wood, J., concurring in part and dissenting in part).

There may be a few compelling cases in which an appellate court should exercise its oversight to consider arguments forfeited by the government, as we did in *Jackson*, to ensure the "fairness, integrity, or public reputation of judicial proceedings." See, *e.g.*, *United States v. Olano*, 507 U.S. 725, 732-34 (1993). In such rare cases, "the question of how the familiar rules about obviousness of the error and prejudice apply to the prosecutor is an exceedingly difficult one." *Jackson*, 207 F.3d at 922 (Wood, J., concurring in part and dissenting in part). We note here only that, but for those extreme cases that

clearly implicate miscarriages of justice insulting the public interest, it seems the government will usually be hard-pressed to identify exactly a substantial right that would justify plain error review.[4]

Assuming, consistent with the panel decision in *Jackson*, that at least some plain errors can be corrected for the benefit of the government, we are confident that there was no plain error here. The district court's decision to grant the Rule 29 motion without considering an aiding-and-abetting theory not argued before it did not compromise the integrity, fairness, or public reputation of judicial proceedings. It would be extraordinary to reinstate a jury's guilty verdict on a theory that was never argued to the jury and almost certainly never considered by it. When an advocate, here the government, does not pursue an argument before a trial court, the plain error standard requires us to decide, in essence, whether the error was so obvious and serious that the trial judge should have overridden the normal function of the adversarial system to take action on her own. This was not such a situation.

Finally, even if the new aiding-and-abetting theory had been preserved, we are skeptical of its merits. Aiding and abetting possession with intent to distrib-

---

[4] As Judge Wood wrote: "It is interesting to speculate about whether the government can ever establish prejudice for Rule 52(b) purposes, but [we] have no need at this juncture to rule out that possibility absolutely." 207 F.3d at 923 (Wood, J., concurring in part and dissenting in part).

ute requires showing knowledge of the distribution, a desire that the transaction be successful, and an affirmative act of assistance. *United States v. Allen*, 390 F.3d 944, 948 n.1 (7th Cir. 2004). The prohibition on speculative inferences based solely on guilt by association or mere presence is especially relevant in aiding-and-abetting cases, and the government would therefore confront similar hurdles with this theory. See *United States v. Williams,* 341 U.S. 58, 64 n.4 (1951) ("To be present at a crime is not evidence of guilt as an aider or abettor."); *United States v. Heath,* 188 F.3d 916, 922 (7th Cir. 1999) ("[I]t is not unlawful for someone to be in the company of another."); see also *Ybarra v. Illinois*, 444 U.S. 85, 90 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."); *United States v. Starks*, 309 F.3d 1017, 1022 (7th Cir. 2002) ("When employing the constructive-possession doctrine, however, courts must be mindful not to sweep within the doctrine's purview the innocent bystander who is merely present while others engage in illegal drug activity. To avoid a tendency towards guilt by association, courts must attempt to distinguish the true possessor from the ordinary bystander."); *United States v. Gill*, 58 F.3d 334, 336 (7th Cir. 1995) ("Under the rule of constructive possession, courts attempt to distinguish between knowing possession and guilt by association."). This argument raised for the first time on appeal does not support reversal.

IV. *Conclusion*

In reviewing a district court's grant of a Rule 29 motion, we must refrain from making our own credibility determinations. We take the government's evidence and evaluate whether it could create a reasonable inference or inferential chain that establishes each element of the charged offense beyond a reasonable doubt. If a necessary inference relies on speculation, it is not reasonable and not permitted. The jury's verdict here relied on several such speculative inferences. The evidence could not support a verdict of guilt beyond a reasonable doubt. We recognize that Jones' activities were suspicious, and he did not offer evidence of actual innocence. But that was not his burden. Simply put, our criminal justice system does not tolerate the conviction and imprisonment of people based on suspicion, speculation, and association with criminals. The government must present direct or circumstantial evidence of each element of each charged offense. The government failed to do that here and cannot fill the gaps with inferences of guilt by association or evidence of an individual's mere presence somewhere criminal activity may have occurred.

The judgment of the district court is AFFIRMED.